#25849-a-GAS

**2012 S.D. 18**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

In re: the Administration of the
FLORENCE Y. WALLBAUM REVOCABLE
LIVING TRUST AGREEMENT.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE FIRST JUDICIAL CIRCUIT
YANKTON COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE ARTHUR L. RUSCH
Judge

* * * *

MICHAEL D. BORNITZ
BOBBI L. THURY of
Cutler & Donahoe, LLP
Sioux Falls, South Dakota          Attorneys for appellants
         Lori Hoesing, Carla Malik
         and Lisa Brueckner.


MITCHELL A. PETERSON
CHERYLE WIEDMEIER GERING of
Davenport, Evans, Hurwitz & Smith, LLP
Sioux Falls, South Dakota          Attorneys for appellee
         First Dakota National Bank.

* * * *

ARGUED NOVEMBER 16, 2011

OPINION FILED **03/07/12**

#25849

SEVERSON, Justice

[¶1.] Certain remainder beneficiaries of the Florence Y. Wallbaum Revocable Living Trust petitioned the trial court to interpret the terms of the trust and to determine whether the trustee breached its fiduciary duties. The trial court found the trust was ambiguous. After considering extrinsic evidence, the trial court found that the settler of the trust, Florence Wallbaum, intended for the trustee to use trust principal to maintain the Wallbaum residence. The trial court also ruled the trustee did not breach its fiduciary duties in administering the trust. The remainder beneficiaries of the trust appeal, raising the following issues: (1) whether the trial court erred in interpreting the terms of the trust; (2) whether the trial court erred in finding Florence intended for the trustee to expend trust principal to maintain the Wallbaum residence; and (3) whether the trial court erred in finding the trustee did not violate its fiduciary duties. We affirm.

## Background

[¶2.] Florence Wallbaum established the Florence Y. Wallbaum Revocable Living Trust (Trust) on June 17, 1991. The beneficiaries of the Trust were Florence's children and grandchildren. Florence had two children, Douglas Wallbaum and Daniel Wallbaum. Daniel was married and had four daughters: Lori Hoesing, Carla Malik, Lisa Brueckner, and Julie Allen. Douglas was not married and had no children. At the time the Trust was created, Douglas was a member of the Community of Damien of Molokoi, a religious order whose monastery was located in Albuquerque, New Mexico. Although the religious order provided

- 1 -

Douglas with food, housing, and other necessary support, Douglas earned very little additional income.

[¶3.] To address concerns Florence had regarding Douglas's ability to manage money, a spendthrift clause was included in Article VIII of the Trust. The spendthrift clause provided:

> No title in the trust or in the income therefrom shall vest in any beneficiary and neither the principal nor the income of any such trust shall be liable for the debts of any beneficiary and no beneficiary shall have any power to sell, assign, transfer, encumber or in any other manner to anticipate or dispose of his or her interest in any such trust or the income produced thereby prior to the actual distribution in fact by the Trustee to said beneficiaries.

[¶4.] Under Article XI of the Trust, if the trustee determined the continued administration of the Trust was unduly burdensome or expensive, the Trust was to terminate and all Trust assets were to be "distributed to the person or persons then entitled to receive the net income to such trust in the proportions in which they are entitled to receive such net income." Florence appointed herself as trustee and First Dakota National Bank (First Dakota) as successor trustee.

[¶5.] Florence amended the Trust three times.[1] However, Article VIII and Article XI of the Trust remained unchanged. The third and final amendment to the Trust, which went into effect on June 3, 1997, amended the distribution of assets set forth under Article III(4)(b) of the Trust. The portion of the amended version of Article III(4)(b) that is relevant to this appeal provides as follows:

---

1. The first amendment went into effect March 27, 1996, and the second amendment went into effect May 23, 1997.

The real estate listed on Schedule A and referred to as the "home tract" is to be distributed outright to my son, Daniel L. Wallbaum, should he survive me; should he not survive me, to his issue in equal shares. The real estate listed on Schedule A as my residence and the parcel denominated "The Inch Farm", as well as my undivided one-third interest in the Nebraska farm shall be held in trust by First Dakota National Bank for my son, Douglas Wallbaum, under the following terms and conditions:

1.      Douglas Wallbaum is hereby given a life estate in the real estate listed on Schedule A as my residence. It is my intention that Douglas shall be allowed to live in the home if and when he desires. Should Douglas decide not to reside there he shall notify the trustee in writing and trustee shall have discretion to rent the home. At Douglas' [sic] death or sooner if Trustee, in its sole discretion, determines that Douglas for reasons of incapacity is unable to occupy the home, the property, known as my residence shall be distributed outright to my four granddaughters should they survive me; should they not survive me to their issue by right of representation.

2.      The real estate parcel denominated the "Inch Farm" along with my undivided one-third interest int he [sic] Nebraska farm shall be held in trust for my son, Douglas Wallbaum, and he shall have a life estate in the income generated by said real estate. It is my intention that my Trustee manage this portion of the trust to assure that the Inch Farm is preserved in its entirety for my grandchildren and that my undivided one-third interest in the Nebraska farm is managed compatibly with the interests of my brother, Frank, and my sister, Alice. Upon the death of my son, Douglas Wallbaum, said real estate shall be distributed to my four granddaughters, should they survive me; should they not survive, to their issue by right of representation.

3.      Any other property, real or personal, shall be divided into equal portions with one-half (1/2) being distributed outright to my son, Daniel Wallbaum, should he survive me; should he not survive me, to his issue in equal shares. The remaining one-half (1/2) shall be held in trust for my son, Douglas Wallbaum, and he shall have a life estate in the income generated by said property. It is my intention that my trustee manage this portion of the trust to assure income therefrom. Any accounts being advised by Wayne Ibarolle distributed to the trust shall remain with Mr. Ibarolle. Upon the death of my son, Douglas Wallbaum, said property shall be distributed to my four

> granddaughters should they survive me; should they not survive
> me, to their issue by right of representation.
>
> 4.     That such income be paid by my Trustee to Douglas
> Wallbaum in such installments as are convenient but at least
> quarterly.

[¶6.]     Florence died on July 7, 1998, at which time First Dakota became trustee.  Shortly after Florence's death, Douglas left the religious order and moved back to Yankton where, pursuant to Article III(4)(b)(1), he lived in the Wallbaum residence.  Although Article III(4)(b)(4) of the Trust required the trustee to make quarterly income distributions to Douglas, First Dakota did not strictly adhere to this provision of the Trust.  Instead, First Dakota made income distributions to Douglas on an "as-needed" basis.  Douglas raised no objection to First Dakota's method of distributing income.

[¶7.]     While First Dakota initially used Trust income to maintain the Wallbaum residence for Douglas, it soon concluded that the income from the Trust was insufficient.  First Dakota contacted Celia Miner, the attorney who assisted Florence in drafting the Trust.  Miner advised First Dakota that the principal of the Trust could be used to maintain the Wallbaum residence for Douglas.  First Dakota then began to invade Trust principal to cover ordinary maintenance, taxes, and other charges associated with the residence.

[¶8.]     Approximately one year later, First Dakota became concerned about the deteriorating condition of the Wallbaum residence.  After evaluating the cost of maintenance, First Dakota concluded it would be in the best interest of the beneficiaries of the Trust to sell the residence and purchase a condominium for

Douglas to live in. First Dakota also determined it would be in the best interest of the beneficiaries of the Trust to sell the Inch Farm.

[¶9.] In the fall of 1999, all the beneficiaries of the Trust signed consent forms agreeing to the sale of the Wallbaum residence and the Inch Farm. Although the beneficiaries consented to the sale of the residence for $94,000, First Dakota eventually sold the residence for $80,000 and purchased a condominium in Yankton for Douglas to live in.[2] First Dakota notified the beneficiaries that the residence was sold for $80,000 in a letter dated September 13, 2000.[3]

[¶10.] In February of 2009, on the advice of an attorney, First Dakota sent a letter to Florence's grandchildren explaining that First Dakota had used Trust principal to maintain the Wallbaum residence and the condominium Douglas lived in after the Wallbaum residence was sold. Florence's grandchildren did not believe First Dakota had the authority to invade Trust principal for this purpose. On November 10, 2009, Lisa Brueckner, Lori Hoesing, and Carla Malik, three of Florence's four grandchildren, petitioned the court to interpret the terms of the Trust.[4] In this petition, the grandchildren also alleged First Dakota breached its fiduciary duties and violated the terms of the Trust by (1) improperly selling the Wallbaum residence and the Inch Farm without the consent of the beneficiaries and

---

2. The Wallbaum residence was appraised at $76,000 prior to its sale.

3. First Dakota also sold the Nebraska Farm in 2005. The sale of the Nebraska Farm is not at issue in this appeal.

4. Both parties petitioned for court supervision of the Trust. The trial court assumed supervision of the Trust in an order filed January 12, 2010.

without court approval; (2) obtaining consent from the beneficiaries of the Trust to sell the Wallbaum residence and the Inch Farm without first informing the beneficiaries of their rights under the Trust; and (3) failing to make quarterly income distributions to Douglas in accordance with Article III(4)(b)(4) of the Trust.

[¶11.] First Dakota filed objections to the grandchildren's petition. First Dakota also petitioned for court approval of Trust accountings and petitioned to modify or reform the Trust to clarify Florence's intent. In its petition, First Dakota argued Florence intended to allow the trustee to invade Trust principal to maintain the Wallbaum residence.

[¶12.] First Dakota moved for summary judgment on its petition to modify or reform the Trust. That same day, Florence's grandchildren moved for partial summary judgment on their petition for the court to interpret the terms of the Trust and on First Dakota's petition to modify or reform the Trust. The trial court denied the grandchildren's motion for partial summary judgment. The grandchildren later renewed their motion.

[¶13.] First Dakota's motion for summary judgment and the grandchildren's renewed motion for partial summary judgment were heard by the trial court on the same day. In a memorandum opinion dated April 22, 2010, the trial court found that there were genuine issues of material fact as to whether First Dakota had authority to invade the principal of the Trust to maintain the Wallbaum residence. The trial court thus denied First Dakota's motion for summary judgment as well as the grandchildren's motion for partial summary judgment.

[¶14.] A court trial on First Dakota's petition for court approval of Trust accountings and to modify or reform the Trust, as well as the grandchildren's petition for the court to interpret the terms of the Trust was held on May 17 through May 20, 2010. After hearing the evidence, the trial court issued a second memorandum decision dated August 22, 2010.

[¶15.] The trial court concluded that the language of the Trust dealing with the Inch Farm, the Nebraska Farm, and the one-half interest in the other property was unambiguous, and that Florence intended for First Dakota to distribute income from these assets to Douglas for life in accordance with the limitations set forth in Article III(4)(b). However, the trial court determined that the portion of the Trust dealing with the Wallbaum residence was ambiguous.

[¶16.] After concluding that the portion of the Trust dealing with the Wallbaum residence was ambiguous, the trial court considered extrinsic evidence to determine Florence's intent. At the conclusion of the trial, the trial court found that Florence intended to make the Wallbaum residence available for Douglas to live in as long as he wished. Therefore, First Dakota was authorized to use principal for the necessary expenses of the home, including taxes, insurance, capital expenditures, and utilities. But the trial court determined Douglas was responsible for paying any living expenses that were separate and apart from the costs necessary to maintain the Wallbaum residence.

[¶17.] In addition, the trial court found that under SDCL 55-3-26, there were no unforeseen circumstances or mistakes of law or fact that would justify modifying

the terms of the Trust. The trial court therefore denied First Dakota's petition for modification.

[¶18.] The trial court also addressed the grandchildren's various allegations that First Dakota improperly administered the Trust and violated its fiduciary duties. The trial court found these claims lacked merit. First Dakota's accountings were approved with the exception of $1,470.22, which the trial court ordered returned to the Trust because the funds were improperly distributed to Douglas.

## Analysis

[¶19.] 1. **Whether the trial court erred in finding the Trust was ambiguous.**

[¶20.] When interpreting a trust instrument, "[t]he court's task is to ensure that the intentions and wishes of the settlor are honored." *Luke v. Stevenson*, 2005 S.D. 51, ¶ 8, 696 N.W.2d 553, 557 (citing *Briggs v. Briggs,* 73 S.D. 500, 506, 45 N.W.2d 62, 65 (1950)). If the language of the trust instrument makes the intention of the settlor clear, it is our duty "to declare and enforce it." *Id.* But if the language of the trust instrument is not clear, "'construction of an ambiguous trust instrument is a question of law to be decided by the court.'" *Id.* (quoting *In re Estate of Stevenson,* 2000 S.D. 24, ¶ 14, 605 N.W.2d 818, 821). We review questions of law under the de novo standard. *Id.* (citing *Beals v. Wagner,* 2004 S.D. 115, ¶ 5, 688 N.W.2d 415, 417).

[¶21.] In interpreting a trust instrument, "'[a]ll the words and provisions appearing in [the trust] must be given effect as far as possible, and none should be cast aside as meaningless.'" *In re Estate of Klauzer*, 2000 S.D. 7, ¶ 10, 604 N.W.2d 474, 477 (quoting *In re Estate of Jetter*, 1997 S.D. 125, ¶ 20, 570 N.W.2d 26, 31).

"'[A]n ambiguity is not of itself created simply because the parties differ as to the interpretation of the trust instrument.'" *Stevenson,* 2000 S.D. 24, ¶ 14, 605 N.W.2d at 821 (quoting *Johnson v. Johnson*, 291 N.W.2d 776, 778-79 (S.D. 1980)). Rather, "'[l]anguage is ambiguous when it is reasonably capable of being understood in more than one sense.'" *In re Estate of Brownlee*, 2002 S.D. 142, ¶ 17, 654 N.W.2d 206, 210 (quoting *Klauzer*, 2000 S.D. 7, ¶ 10, 604 N.W.2d at 477).

[¶22.] Under Article III(4)(b)(2), the Inch Farm and a one-third interest in the Nebraska Farm were to be held in the Trust for Douglas's benefit. Douglas was granted a "life estate" in the income generated from the Inch Farm and the one-third interest in the Nebraska Farm. Under Article III(4)(b)(1), the Wallbaum residence was also to be held in the Trust for Douglas's benefit. Douglas was granted a "life estate" in the residence. The dispute in this case centers on the use of the term "life estate" under Article III(4)(b)(1).

[¶23.] Florence's grandchildren argue that under SDCL 43-8-2, Douglas was responsible for maintaining the Wallbaum residence, and First Dakota did not have authority to invade Trust principal for that purpose. SDCL 43-8-2 provides that "[t]he owner of a life estate must keep the building and fences in repair from ordinary waste, and must pay the taxes and other annual charges, and a just proportion of extraordinary assessments benefiting the whole inheritance." *See Thomas v. Thomas*, 2003 S.D. 39, ¶¶ 17-23, 661 N.W.2d 1, 6-7 (recognizing the general rule that one who holds a life estate must maintain the property and pay taxes).

[¶24.]    We do not believe that SDCL 43-8-2 applies to Douglas's interest in the Wallbaum residence. SDCL chapter 43-8 governs present estates in real property. SDCL 43-8-1 provides, "The owner of a life estate may use the land in the same manner as the *owner of a fee simple*, except that he must do no act to the injury of the inheritance." (Emphasis added.) The duties set forth under SDCL 43-8-2 apply only to "owner[s] of a life estate." In this case, Florence conveyed the Wallbaum residence to First Dakota as trustee. Under the terms of the Trust, Douglas was "allowed to live in the home if and when he desires."[5] However, Douglas was not the "owner of a life estate" as the term is used in SDCL 43-8-2. Rather, Douglas held an interest in the Wallbaum residence as a beneficiary of the Trust.

[¶25.]    When the Trust is read as a whole, it is unclear whether Florence intended for Douglas to maintain the Wallbaum residence or whether the trustee was to invade Trust principal in order to maintain the residence. The Trust is "'reasonably capable of being understood in more than one sense. . . .'" *See Brownlee*, 2002 S.D. 142, ¶ 17, 654 N.W.2d at 210 (quoting *Klauzer*, 2000 S.D. 7, ¶ 10, 604 N.W.2d at 477). Therefore, we hold the trial court did not err in finding the Trust ambiguous.

[¶26.]    **2.    Whether the trial court abused its discretion in finding Florence intended Trust principal to be used to maintain the Wallbaum residence.**

---

5.    The Trust went on to state, "Should Douglas decide not to reside [in the Wallbaum residence,] he shall notify [First Dakota] in writing and [First Dakota] shall have discretion to rent the home."

[¶27.]    When a trust is ambiguous, extrinsic evidence can be used to determine the settlor's intent. *Luke*, 2005 S.D. 51, ¶ 11, 696 N.W.2d at 558. *See Klauzer,* 2000 S.D. 7, ¶ 10, 604 N.W.2d at 477 (stating that when interpreting a will, "[e]xtrinsic evidence is admissible to clarify any ambiguity"). "[R]esolution of an ambiguity by extrinsic evidence is a finding of fact that will not be set aside unless it is clearly erroneous." *Matter of Estate of Brown*, 559 N.W.2d 818, 822 (N.D. 1997).

[¶28.]    In this case, the evidence in the record supports the trial court's finding that Florence intended for First Dakota to have the authority to invade Trust principal to maintain the Wallbaum residence. At the court trial, Miner testified Florence was very close to Douglas. Miner further testified that Douglas was financially irresponsible. As a result, Florence provided Douglas with financial assistance throughout his life. The level of financial support Florence provided to Douglas far exceeded the support Florence provided to her granddaughters during her life. Miner testified that by creating the Trust, Florence intended to take care of Douglas and to ensure Douglas always had a place to live.

[¶29.]    In determining Florence's intent, the trial court also considered the testimony of Judy Wallbaum, Daniel Wallbaum's wife, who Florence confided in prior to her death. Judy testified that Florence created the Trust because Douglas did not manage money well, and Florence did not want Daniel to be burdened with Douglas's care. Judy also testified that regardless of Florence's frustrations with Douglas, Florence repeatedly expressed her intention to take care of him.

[¶30.]     There is ample evidence in the record to support the trial court's finding that Florence intended for First Dakota to have the authority to invade Trust principal to maintain the Wallbaum residence.  We therefore hold that the trial court's finding was not clearly erroneous.

[¶31.]     3.     **Whether the trial court erred in finding the trustee did not violate any fiduciary duties.**

[¶32.]     We have stated a "trustee's first duty as a fiduciary is to act in all things wholly for the benefit of the trust."  *Willers v. Wettestad*, 510 N.W.2d 676, 680 (S.D. 1994) (citing *Schroeder v. Herbert C. Coe Trust,* 437 N.W.2d 178 (S.D. 1989); Restatement (Second) of Trusts §§ 175, 176 (1959)).  A trustee owes the beneficiaries of a trust the duty of loyalty, which requires the trustee to preserve trust assets and "'administer the trust solely in the interest of the beneficiar[ies].'"  *Id.* (quoting Restatement (Second) of Trusts § 170 (1959)).  Moreover, "[i]n all matters connected with his trust a trustee is bound to act in the highest good faith toward his beneficiary and may not obtain any advantage therein over the latter by the slightest misrepresentation, concealment, threat, or adverse pressure of any kind."  SDCL 55-2-1.

[¶33.]     "Whether one breaches a fiduciary duty is a question of fact."  *Weekley v. Prostrollo,* 2010 S.D. 13, ¶ 11 n.3, 778 N.W.2d 823, 827 n.3 (citing *Ward v. Lange,* 1996 S.D. 113, ¶ 12, 553 N.W.2d 246, 250).  "We review questions of fact under the clearly erroneous standard of review."  *Id.* (citing *In re Regennitter,* 1999 S.D. 26, ¶ 11, 589 N.W.2d 920, 923).

*The sale of the Wallbaum residence and the Inch Farm*

[¶34.]     Florence's grandchildren argue First Dakota improperly sold the Wallbaum residence and the Inch Farm without the consent of the beneficiaries and without court approval. They note that the beneficiaries of the Trust consented to the sale of the Wallbaum residence for $94,000. Nonetheless, First Dakota sold the residence for $80,000. In addition, First Dakota did not seek court approval before selling the Wallbaum residence or the Inch Farm. Florence's grandchildren contend First Dakota's actions violated SDCL 55-3-5, which provides:

> A trustee must fulfill the purposes of the trust as declared at its creation, or as subsequently amended, and must follow all the directions of the trustor given at that time, except as modified by the consent of all parties interested, and upon approval by the court.

[¶35.]     In its memorandum opinion, the trial court acknowledged that First Dakota may have violated SDCL 55-3-5 when it sold the Wallbaum residence and the Inch Farm. But the trial court concluded there was no evidence that the Trust suffered a monetary loss as a result of the sale of these properties. Therefore, the trial court denied the grandchildren's request to require First Dakota to reimburse the Trust.[6]

---

6.     The proceeds of the sale of the Inch Farm and the Wallbaum residence were paid to the Trust. Nonetheless, Florence's grandchildren asked the trial court to order First Dakota to pay the Trust the full value of the Wallbaum residence and the Inch Farm. In support of their position, the grandchildren cited to the Restatement (Second) of Trusts § 208 (1959), which provides, "If the trustee sells trust property which it is his duty to retain, the beneficiary can (a) charge him with its value at the time of such sale, with interest thereon . . . ." However, Comment c to § 208 specifies, "If the trustee has paid into the trust the proceeds of the sale, he will be credited with the amount so paid and any income which has accrued to the trust estate thereon." Thus, if First Dakota breached a fiduciary duty to the Trust beneficiaries by selling the Wallbaum residence and the Inch Farm, First Dakota would only be

(continued . . .)

[¶36.] "If the trustee commits a breach of trust, he is chargeable with any loss or depreciation in value of the trust estate resulting from the breach of trust." *Willers*, 510 N.W.2d at 680-81 (citing Restatement (Second) of Trusts § 205(a) (1959); 76 Am.Jur.2d *Trusts* § 367 (1992)). "The amount of damages awarded by the trial court is a factual issue governed by the clearly erroneous standard." *Id.* at 681 (citing *Gross v. Connecticut Mut. Life Ins. Co.*, 361 N.W.2d 259 (S.D. 1985)).

[¶37.] In this case, Florence's grandchildren failed to present evidence that either the Inch Farm or the Wallbaum residence was sold for less than market value. The record shows the Trust received all the proceeds generated from the sale of the Inch Farm and the Wallbaum residence. The Trust also received all the income generated from the sale of these properties. Given the lack of evidence of a loss or depreciation in value of the Trust estate, we hold the trial court did not err in refusing to order First Dakota to reimburse the Trust.[7]

[¶38.] Florence's grandchildren also argue the trial court erred in failing to remove First Dakota from its position as trustee. But in making this argument, Florence's grandchildren fail to specify the grounds on which First Dakota should

---

(. . . continued)
required to reimburse the Trust for any loss or depreciation in the value of the Trust estate.

7. Florence's grandchildren also argued that First Dakota breached its fiduciary duties by failing to inform the beneficiaries of their rights under the Trust before asking them to consent to the sale of the Inch Farm and the Wallbaum residence. In addition, the grandchildren alleged First Dakota pressured them into consenting to the sale of these properties. Because the grandchildren have failed to present evidence that they were damaged as a result of the sale of the Inch Farm and the Wallbaum residence, we need not address the merit of these claims.

have been removed from its position as trustee. In fact, Florence's grandchildren did not cite to any authority in support of their argument. Florence's grandchildren therefore waive this issue on appeal. *See State v. Fool Bull*, 2009 S.D. 36, ¶ 46, 766 N.W.2d 159, 169 ("'The failure to cite to supporting authority is a violation of SDCL 15-26A-60(6) and the issue is thereby deemed waived.'" (quoting *State v. Pellegrino*, 1998 S.D. 39, ¶ 22, 577 N.W.2d 590, 599)).

*Income distributions*

[¶39.]     Florence's grandchildren allege First Dakota failed to make quarterly income distributions to Douglas in accordance with Article III(4)(b)(4) of the Trust. The trial court determined that the grandchildren did not have standing to object to the timing of the distributions. We agree.

[¶40.]     We have declared that "[s]tanding is established through being a 'real party in interest' . . . ." *Arnoldy v. Mahoney*, 2010 S.D. 89, ¶ 19, 791 N.W.2d 645, 653. *See* SDCL 15-6-17(a) ("Every action shall be prosecuted in the name of the real party in interest."). "'The real party in interest requirement for standing is satisfied if the litigant can show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant.'" *Arnoldy*, 2010 S.D. 89, ¶ 19, 791 N.W.2d at 653 (quoting *D.G. v. D.M.*, 1996 S.D. 144, ¶ 22, 557 N.W.2d 235, 239).

[¶41.]     In this case, it is undisputed that First Dakota did not adhere to Article III(4)(b)(4) of the Trust, which required the trustee to make quarterly income distributions to Douglas. Instead, First Dakota made income distributions to Douglas on an "as-needed" basis. However, because Florence's grandchildren had

no interest in the income First Dakota distributed to Douglas, they did not suffer any "actual or threatened injury" as a result of First Dakota's actions. Florence's grandchildren thus do not have standing to assert a claim against First Dakota for its failure to make quarterly income distributions to Douglas.

[¶42.]    Florence's grandchildren also argue First Dakota violated the terms of the Trust and breached its fiduciary duties to the remainder beneficiaries by making income distributions to Douglas that exceeded Trust income. The income distributions First Dakota made to Douglas varied from year to year. There is evidence in the record indicating that in certain years, the income distributions First Dakota made to Douglas exceeded Trust income. In other years, First Dakota did not distribute to Douglas all the income he was entitled to receive under the terms of the Trust. Based on our review of the record, it is unclear whether the total income distributions First Dakota made to Douglas as of the date of the court trial exceeded Trust income. Therefore, we hold that the trial court did not abuse its discretion in finding First Dakota was not required to reimburse the Trust for income distributions it made to Douglas.

*Attorneys' Fees*

[¶43.]    In a third memorandum decision dated November 24, 2010, the trial court found the attorneys' fees First Dakota incurred during the course of litigation were reasonable. The trial court also found First Dakota had the authority to charge the attorneys' fees to the Trust. Florence's grandchildren argue the trial court's findings with regard to attorneys' fees were clearly erroneous. However, Florence's grandchildren fail to cite any legal authority to support their argument.

This issue is therefore deemed waived.[8]  *See Fool Bull*, 2009 SD. 36, ¶ 46, 766 N.W.2d at 169.  *See Kostel v. Schwartz*, 2008 S.D. 85, ¶ 34, 756 N.W.2d 363, 377 ("Failure to cite relevant supporting authority is a violation of SDCL 15-26A-60 and is deemed a wavier.").

[¶44.]     Affirmed.

[¶45.]     GILBERTSON, Chief Justice, and KONENKAMP, ZINTER, and WILBUR, Justices, concur.

---

8.     Florence's grandchildren also assert the trial court should have disgorged First Dakota's trustee fees.  Because the grandchildren failed to cite authority in support of this argument, this issue is also waived.