#26748-a-DG

**2014 S.D. 26**

IN THE SUPREME COURT

OF THE

STATE OF SOUTH DAKOTA

* * * *

IN THE MATTER OF THE
ESTATE OF EARL W. LONG,
DECEASED.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE SEVENTH JUDICIAL CIRCUIT
FALL RIVER COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE WALLY EKLUND
Judge

* * * *

PATRICK M. GINSBACH
Farrell, Farrell & Ginsbach, PC
Hot Springs, South Dakota                    Attorneys for appellant Brenda
                                             F. Long-Chafin.


AARON T. GALLOWAY
Lynn, Jackson, Shultz & Lebrun, PC
Rapid City, South Dakota                     Attorneys for appellee
                                             Vicky J. Smith.


QUENTIN L. RIGGINS
Gunderson Palmer Nelson &
   Ashmore, LLP
Rapid City, South Dakota                     Attorneys for appellee
                                             Lynda Davis.

* * * *

CONSIDERED ON BRIEFS
ON FEBRUARY 18, 2014
OPINION FILED **04/30/14**

#26748

GILBERTSON, Chief Justice

[¶1.]       Brenda Chafin challenges the validity of her father's estate plan.  After a formal probate proceeding, the circuit court determined that the estate plan was valid.  We affirm.

**Facts and Procedural History**

[¶2.]       Earl Long passed away at the age of 78 on February 26, 2010.  He was survived by four daughters: Vicky, Lynda, Diann, and Brenda.  Earl's daughters are the only heirs of the estate.

[¶3.]       Prior to his death, Earl and his late wife, Shirley, had operated two seasonal resorts.  One of the resorts, Long's Seasonal Resort, was active at the time of Earl's death.  Although each daughter worked at the Seasonal Resort, Vicky and her husband, Dean, worked there most consistently and for the longest period of time.

[¶4.]       Earl began the process of planning his estate in 2005.  His first step in the planning process was a meeting with his attorney, Mark Walters.  Three of Earl's daughters also attended the meeting; however, Vicky and Dean did not attend.  Among the topics discussed at the meeting were strategies to reduce conflict upon Earl's death, trust protection for Brenda, gifting of land, and a creation of a limited liability company (LLC) to hold property separate from Earl's trust.

[¶5.]       On August 30, 2008, Earl properly executed a "pourover" will.  The will stated that all property would be distributed to his trust "as amended."  On the

-1-

same day, Earl executed The Earl W. Long Trust, which was a revocable trust with Earl appointed as trustee.

[¶6.] Following the execution of his will and trust, Earl began gifting some of his assets. On October 3, 2009, Earl executed a memorandum of gifts, which was notarized by Walters and witnessed by Vicky and Dean. Earl executed a second memorandum of gifts on October 5, which was witnessed by Dean and Lynda. The contents of both memorandums were relatively the same. The memorandums documented gifts to Earl's four daughters of approximately $250,000 each.

[¶7.] In accordance with the memorandums of gifts, Earl acquired land from Vicky so that the land could be given to the other three daughters. In return, Earl deeded Vicky his half interest in the "home place." Earl intended for the value of the home place to be greater than the value of the land deeded by Vicky so that the difference in value between the two properties was a gift to Vicky.[1] The October 5 memorandum specified that Vicky acquired the home place subject to a life estate, which reserved the income from the Seasonal Resort in favor of Earl.

[¶8.] Earl next gave property to his other daughters. Diann received a gift of land free of encumbrances by warranty deed on October 3. Lynda also received a gift of land free of encumbrances on October 3. In July 2007, Earl had purchased both a piece of property and a mobile home for Brenda, which became her permanent residence. In September 2008, Brenda deeded her half interest as a joint tenant in the property to Earl. In exchange, Earl created a trust for Brenda to provide for her after his passing. Brenda raised no objection to the trust and she

---

1. The value of the land was based on an appraisal conducted in 2005.

continued to live on the property. On October 3, 2009, Earl transferred the property into Brenda's trust. In addition, Earl gave Brenda $100,000 to fund her trust and $20,000 cash outside the trust.

[¶9.]       Later in the fall of 2009, Earl began assessing which property, apart from the property he had already given, would be put into his trust to be distributed upon his death. To carry out his estate plan Earl developed color-coded "maps" that outlined how the remaining land would be divided. Land allocated to Brenda's trust was colored pink. Land allocated to Diann was green. Lynda's land was blue; and Vicky's land was yellow. Land in trust, to be distributed at death to the LLC, was orange. Lastly, "striped" land represented the land that had previously been given to the daughters through the memorandum of gifts. Earl ultimately selected a map, which was dated December 12, 2009, and initialed "EWL."

[¶10.]      On January 23, 2010, Earl amended Brenda's trust so that all income from the trust would no longer be distributed to Brenda on a monthly basis. Instead, the income would pay for her basic housing expenses and maintenance of her residence. Brenda's amended trust gave discretion to the trustee to pay health, dental, and car insurance.

[¶11.]      Earl also amended his trust on January 23. The amendment added "Section 6.3," which referenced the map created on December 12, 2009. The amendment also set forth the color-coded property designation. Additionally, the amendment stated that the trustee would create an LLC to hold designated land to be sold. Vicky was selected to manage the LLC "for the four children equally after [Earl was] gone."

[¶12.] Earl died on February 26, 2010. Following his death, Vicky filed the Articles of Organization for Long Land Company, LLC on April 13, 2010. After Earl's passing, Brenda executed a document accepting the plan of distribution of the color-coded map. Brenda also executed a document consenting to the use of certain equipment, machinery, and other personal property for maintaining the lots held by the LLC. The four daughters agreed to the sale of two parcels of property by the LLC and each daughter received an equal share of the sale proceeds.

[¶13.] In accordance with Earl's will, Vicky and Dean were named co-personal representatives for the estate. Prior to the closing of the estate under informal probate, Brenda filed a petition for formal probate of the will. Brenda and Diann had retained counsel to interpret the language of Earl's trust because they had concerns about the income from the Seasonal Resort and the restrictive language of Brenda's trust. Brenda also requested that Diann be named as the personal representative of the estate. In hopes of limiting conflict between the sisters, Vicky did not object to Diann serving as personal representative.

[¶14.] The formal probate proceeding was conducted on December 5, 6, and 17, 2012. The circuit court concluded that Earl's estate plan was valid. The court determined: (1) Earl was competent; (2) neither Vicky nor Dean exercised undue influence over Earl; (3) the trust documents did not call for an equalization of the remaining property; (4) Brenda's trust was properly amended; and (5) Brenda was not entitled to attorney's fees.

[¶15.] Brenda appeals the decision of the circuit court. She raises the following issues on appeal:

1. Whether Earl lacked the requisite testamentary capacity to carry out his estate plan.

2. Whether Earl's estate plan was the result of undue influence.

3. Whether Earl's Trust required the distributions to be equalized.

4. Whether the doctrine of promissory estoppel barred the modification of Brenda's trust.

5. Whether Brenda and her attorney are entitled to attorney fees.

## Analysis and Decision

[¶16.]       1.     *Whether Earl lacked the requisite testamentary capacity to carry out his estate plan.*

[¶17.]       Brenda argues that the circuit court erred when it determined that Earl had the requisite testamentary capacity to carry out the 2009 gifts and the 2010 amendments to his trust.

[¶18.]       Whether Earl possessed the requisite testamentary capacity is a mixed question of law and fact, which requires a compound inquiry. *Stockwell v. Stockwell*, 2010 S.D. 79, ¶ 15, 790 N.W.2d 52, 58. Therefore, we are required to not only review the circuit court's findings of fact, but also the court's application of settled law to those facts. *Id.* For purposes of making a testamentary document, one has a sound mind "if, without prompting, he is able to comprehend the nature and extent of his property, the persons who are the natural objects of his bounty and the disposition that he desires to make of such property." *In re Estate of Dokken*, 2000 S.D. 9, ¶ 13, 604 N.W.2d 487, 491 (quoting *In re Estate of Long*, 1998 S.D. 15, ¶ 21, 575 N.W.2d 254, 257). Additionally, "[t]estamentary capacity is not determined by any single moment in time, but must be considered as to the

condition of the testator's mind a reasonable length of time before and after the [testamentary document] is executed." *Stockwell*, 2010 S.D. 79, ¶ 27, 790 N.W.2d at 62 (citation omitted). Because the 2009 gifts and the 2010 amendments to Earl's trust were executed with a mind toward disposition of the property after death, we treat them as testamentary in nature. *See In re Estate of Pringle*, 2008 S.D. 38, ¶ 24, 751 N.W.2d 277, 285.

[¶19.] To illustrate that Earl lacked testamentary capacity, Brenda relies on Dr. Heather Cwach's medical evaluation. Dr. Cwach examined Earl on October 6, 2009, the day after Earl completed a memorandum of gifts. Dr. Cwach administered a series of tests, including a mini mental-state exam, and found that "[Earl] was alert." She also observed that Earl's exam score was "common," but showed that he was "mildly impaired." Dr. Cwach did acknowledge, however, that educational background could play a role in the score and that Earl had a 9th grade education. Although Dr. Cwach noted "Dementia, probably Alzheimer's disease" in her assessment, she testified that this was not an official diagnosis.

[¶20.] Beyond Dr. Cwach's evaluation, however, Brenda's evidence reveals little about Earl's capacity. In fact, but for that brief moment in time, the evidence proved that Earl had the requisite capacity to execute his estate plan. After his visit with Dr. Cwach, Earl was seen by Dr. John Knecht and was admitted to the Fall River Hospital Swing Bed unit for physical therapy, occupational therapy, and respiratory therapy. No mention was made of dementia or Alzheimer's as a chief complaint. Following his urological surgery, Earl was monitored by Dr. Knecht. Again, there was no mention in Dr. Knecht's notes that Earl suffered from

confusion, dementia, or Alzheimer's. Dr. Knecht saw Earl on a number of other occasions after Earl was discharged from the hospital. Notably, Dr. Knecht conducted a mental health examination of Earl, which was recommended by Walters.[2] After examining Earl on February 9, 2010, Dr. Knecht concluded that Earl had performed so well that it was unnecessary to conduct additional testing. He also noted that Earl was "absolutely normal as far as his mental health status exam today." Dr. Knecht testified that he never observed any indications that Earl suffered from an inability to make decisions for himself.

[¶21.] The circuit court also heard testimony from a number of other individuals who recalled interacting with Earl, both personally and professionally, during the relevant times in question. None of these individuals believed that Earl lacked the mental capacity to make decisions. Some even described him as "sharp as a tack." By contrast, in addition to the testimony of Dr. Cwach, Brenda only offered testimony from one of her coworkers who did not know Earl personally. The circuit court ultimately determined that the evidence overwhelmingly supported that Earl was competent to execute his estate plan. In determining testamentary capacity we have stressed the importance of giving "due regard to the trial court's opportunity to observe the witnesses and the evidence." *Dokken*, 2000 S.D. 9, ¶ 10, 604 N.W.2d at 491 (quoting *In re Estate of Unke*, 1998 S.D. 94, ¶ 11, 583 N.W.2d 145, 148). In light of the evidence presented, the circuit court did not err in determining that Earl had the requisite capacity to carry out his estate plan.

---

2.     Walters later testified that it was common for him to recommend that his clients receive a mental health exam when he can sense a potential estate contest.

[¶22.]     2.     *Whether Earl's estate plan was the result of undue influence.*

[¶23.]     Brenda next argues that the 2009 gifts and the 2010 amendments to Earl's trust were the result of undue influence. Like testamentary capacity, undue influence is a mixed question of fact and law. *Stockwell*, 2010 S.D. 79, ¶ 15, 790 N.W.2d at 58.

[¶24.]     The circuit court concluded that because of Vicky's confidential relationship with Earl, a presumption of undue influence arose. "A presumption of undue influence arises when there is a confidential relationship between the testator and a beneficiary who actively participates in preparation and execution of the will and unduly profits therefrom." *Id.* ¶ 31 (quoting *Pringle*, 2008 S.D. 38, ¶ 39, 751 N.W.2d at 289). "A confidential relationship exists whenever a decedent has placed trust and confidence in the integrity and fidelity of another." *Id.* (quoting *In re Estate of Duebendorfer*, 2006 S.D. 79, ¶ 27, 721 N.W.2d 438, 445). In the instant case, the presumption arose in part because Vicky assisted Earl with writing checks in his later years, helped with the color-coded maps, and offered advice at several meetings.

[¶25.]     Once a presumption of undue influence arises, "the burden of going forward with the evidence shifts to the beneficiary to show he took no unfair advantage of the decedent." *Unke*, 1998 S.D. 94, ¶ 13, 583 N.W.2d at 148 (citation omitted). However, "[t]he ultimate burden remains on the person contesting the will to prove the elements of undue influence by a preponderance of the evidence." *Id.* (citation omitted).

[¶26.] To show the existence of undue influence, the following elements must be established: "(1) [the] decedent's susceptibility to undue influence; (2) [the] opportunity to exert such influence and effect the wrongful purpose; (3) a disposition to do so for an improper purpose; and, (4) a result clearly showing the effects of undue influence." *Stockwell*, 2010 S.D. 79, ¶ 35, 790 N.W.2d at 64 (citation omitted). "For influence to be undue it must be of such a character as to destroy the free agency of the testator and substitute the will of another for that of the testator." *Id.* (quoting *Pringle*, 2008 S.D. 38, ¶ 44, 751 N.W.2d at 291).

[¶27.] Brenda argues that the value of the "home place" property Vicky received demonstrates the effects of undue influence. Brenda alleges that the home place produces an income of approximately $50,000 a year. Furthermore, Brenda contends that Vicky received a property distribution that was valued at $700,550 more than Brenda's property distribution. The circuit court determined that Brenda failed to establish both Earl's susceptibility to undue influence and a result showing the effects of undue influence.

[¶28.] Brenda's evidence did not establish that Vicky exercised undue influence because Brenda did not prove that Earl was susceptible to undue influence. The circuit court highlighted that Earl was an independent person, a rancher, and a businessman. Earl also had the testamentary capacity to carry out his estate plan. Brenda offered little evidence to dispute these facts. Therefore, because Earl was not susceptible to undue influence, the circuit court was correct in determining that the 2009 gifts and the 2010 amendments to the trust were not the product of undue influence

[¶29.] Additionally, Brenda did not prove a result clearly showing the effects of undue influence. Brenda fails to account for whether Earl, in choosing how to divide his assets, may have considered the role each daughter played in the acquisition and maintenance of his land and seasonal resorts. The circuit court noted that Vicky worked with Earl more often than the other sisters. She and her husband assisted Earl with the Seasonal Resort and with ranching responsibilities. While a presumption of undue influence did arise, Vicky has rebutted that presumption. The ultimate burden remains with Brenda, who has failed to establish by a preponderance of the evidence that Vicky exercised undue influence.

[¶30.]        3.        *Whether Earl's trust required the distributions to be equalized.*

[¶31.] Brenda next argues that the circuit court erred by not requiring the trustee to equalize all the remaining property under a review of Earl's entire estate plan. "Trust interpretation is a question of law reviewed de novo." *In re Sunray Holdings Trust*, 2013 S.D. 89, ¶ 11, 841 N.W.2d 271, 274 (citation omitted). When interpreting a trust instrument, we must "ensure that the intentions and wishes of the [settlor] are honored." *Id.* ¶ 14 (quoting *In re Florence Y. Wallbaum Revocable Living Trust*, 2012 S.D. 18, ¶ 20, 813 N.W.2d 111, 117). To carry out the settlor's intentions, "we first 'look to the language of the trust instrument.'" *Id.* (quoting *In re Schwan 1992 Great, Great Grandchildren's Trust*, 2006 S.D. 9, ¶ 12, 709 N.W.2d 849, 852). "If the language of the trust instrument makes the intention of the [settlor] clear, it is our duty to declare and enforce it." *Id.* (quoting *In re Florence Y. Wallbaum Revocable Living Trust*, 2012 S.D. 18, ¶ 20, 813 N.W.2d at 117).

[¶32.] Brenda claims that the circuit court erred by concluding that Earl did not intend for Section 7.3.1 to be active at his death.[3] She alleges that Earl's trust required all four daughters to receive equal shares of Earl's estate plan; however, Vicky received property that was more valuable than the property the other three daughters received. Therefore, Brenda requests that the remaining assets in Earl's estate be distributed in a matter that accounts for the property that Vicky received.

[¶33.] The circuit court concluded that a plain reading of Earl's trust, the 2010 amendments to the trust, and the 2009 memorandums of gifts all illustrated that Earl did not intend for the contingent language of Section 7.3.1 to be active at his death. Additionally, the circuit court noted that Article 7.1 of the trust required that "any property remaining in the Trust (Trust Residue) shall be divided into four shares, one for each of the Grantor's children." But the court observed that the trust did not contain language suggesting that these shares must be divided equally or redistributed to account for the value of the land Vicky received.

[¶34.] A plain reading of Earl's trust supports the circuit court's conclusion. Attorney Walters testified that Section 7.3.1 was intended to be a "catch all" or contingency provision. However, it was unnecessary for this contingency language to be active at Earl's death because Earl had already disposed of his property during

_____

3. Section 7.3.1 of Earl's trust provided in part:

> The trustee is hereby directed to make a summary of all distributions of the Grantor's property . . . . The trustee shall determine each beneficiary's total share of the estate and shall make adjustments to each beneficiary's trust distribution, if necessary, to achieve the percentage of total distribution to each beneficiary as provided for in Article Seven (7) of this trust agreement.

his life through the memorandum of gifts and subsequent amendment to his trust, which divided his property into four shares.

[¶35.]     Brenda maintains, however, that Section 7.3.1 should be used to distribute the estate's remaining property, such as Earl's life insurance plan, to account for the fact that Vicky received more valuable land than the other sisters. But contrary to Brenda's position, Article 7 does not contain any percentages of total distribution for the four daughters. It is true that Section 7.3.2 requires that any distribution "calculation include the value of any property passing as a specific bequest as stated in Section 6.2." And Section 6.2 references any gifts made, specifically stating that any gifts to be contemplated are set forth in "Schedule B." But there is no Schedule B. Additionally, none of the memorandums of gifts reference a Schedule B. Therefore, it would be inappropriate for this Court to give meaning to a nonexistent provision.

[¶36.]     It would also be inconsistent with a plain reading of the trust instrument to assume that Earl intended to equalize land he had already distributed. This is especially true when Article 7.1 of the trust instrument does not require an equalization process to account for the value of the land Vicky received. Furthermore, prior to Earl's death, four shares of property were divided among the four daughters referenced in the land map. The remaining property was placed in the LLC and held for the four daughters "equally," as provided in the trust instrument. Had Earl intended the result Brenda now requests for the remaining property, he would have used language requesting that result. But no such

language exists.  Therefore, a plain reading of the trust instrument supports the circuit court's conclusion.  We affirm the circuit court's decision.[4]

[¶37.] KONENKAMP, ZINTER, SEVERSON, and WILBUR, Justices, concur.

---

4. Brenda asserts two additional claims on appeal: promissory estoppel and a request for attorney's fees.  We conclude that the circuit court did not err in rejecting Brenda's promissory estoppel claim and request for attorney's fees. Accordingly, we affirm on these issues.