#29512, #29560-aff in pt & rev in pt-JMK & MES
**2023 S.D. 8**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

PLAINS COMMERCE BANK, INC.,
a banking corporation,                                        Plaintiff and Appellant,

    v.

MATTHEW A. BECK, a married person;
KELLEY R. BECK, a married person;
MATTHEW A. BECK, Trustee of the
B&B FARM TRUST, u/t/a November, 1,
1999; BROWN COUNTY, a governmental
instrumentality of the State of South Dakota;
MARSHALL COUNTY, a governmental
instrumentality of the State of South
Dakota; DEERE & COMPANY, a corporation,        Defendants,

    and

JAMIE MOECKLY,                                        Intervenor and Appellee.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE FIFTH JUDICIAL CIRCUIT
BROWN COUNTY, SOUTH DAKOTA

\* \* \* \*

THE HONORABLE SCOTT P. MYREN (Appeal #29512)
THE HONORABLE RICHARD A. SOMMERS (Appeal #29560)
Judges

\* \* \* \*

ARGUED
OCTOBER 6, 2021
OPINION FILED **02/15/23**

\* \* \* \*

REED RASMUSSEN of
Siegel, Barnett and Schutz, LLP
Aberdeen, South Dakota

ROGER DAMGAARD
JORDAN J. FEIST of
Woods, Fuller, Shultz and Smith, P.C.
Sioux Falls, South Dakota   Attorneys for plaintiff and
appellant Plains Commerce
Bank.


JOSHUA G. WURGLER
KENNITH L. GOSCH of
Bantz, Gosch & Cremer, LLP
Aberdeen, South Dakota   Attorneys for intervenor and
appellee Jamie Moeckly.

KERN, Justice, and SALTER, Justice

**[¶1.]** **Justice Kern delivers the majority opinion of the Court on Issues 1 through 4. Justice Salter delivers the majority opinion of the Court on Issue 5.**

**[¶2.]** **KERN, Justice, writing for the Court on Issues 1 through 4.**

[¶3.] Gary and Betty Beck created B&B Farms Trust as an irrevocable spendthrift trust in 1999, naming their three children as secondary beneficiaries and themselves as primary beneficiaries. Matthew Beck, their youngest child, served as Trustee. In 2015, Matthew took out a large personal loan with Plains Commerce Bank and granted a mortgage to Plains Commerce on $800,000-worth of Trust real estate as partial collateral. All beneficiaries of the Trust signed a consent to mortgage the Trust real estate prepared by their family attorney at the request of Plains Commerce. Matthew defaulted on the loan, and Plains Commerce commenced a foreclosure action against Matthew in his capacity as Trustee for B&B Farms Trust. Jamie Moeckly intervened in the action on behalf of the Trust and the parties filed cross-motions for summary judgment on whether Plains Commerce can foreclose on the Trust real estate. The circuit court granted Jamie's motion for summary judgment and denied Plains Commerce's. The court concluded that Matthew's mortgage on Trust real estate was void and unenforceable. The circuit court subsequently awarded attorney fees to Jamie Moeckly. Plains Commerce appeals the court's order granting Jamie summary judgment and her motion for attorney fees. We affirm in part and reverse in part.

## Factual and Procedural Background

[¶4.]        In 1999, Gary Beck and Betty Beck executed a Trust Agreement creating the B&B Farms Trust.  Gary and Betty were the grantors and primary beneficiaries of the Trust.  Their children, Brian Beck, Jamie Moeckly, and Matthew Beck, were named as secondary beneficiaries.  Matthew was designated as the Trustee.  The trust corpus was comprised of the real estate (farmland) owned by Gary and Betty in Brown County, South Dakota.  This real estate was the only asset transferred to the Trust.  In July 2015, the Trust property was appraised at $3,659,000.

[¶5.]        At the same time the Trust was created, Matthew purchased 560 acres of farmland from his parents.  This land was sold directly from Gary and Betty to Matthew and never became part of the Trust.  Matthew obtained personal financing to make this purchase, and Gary and Betty put the proceeds from Matthew's purchase toward paying off a portion of the existing debt on their remaining real estate that was transferred to the Trust.  In her deposition, Betty described the purpose of the Trust as a means to protect Gary and Betty's assets and as a form of estate planning.

[¶6.]        The B&B Farms Trust is an irrevocable[1] spendthrift[2] trust.  During their lives, Gary and Betty were to receive the net income from the Trust as

---

1.     An irrevocable trust is one which may only be terminated under certain circumstances, specifically, "by judicial action or by written agreement entered into by all beneficiaries, if continuance of the trust on its existing terms is not necessary to carry out a material purpose" or "by judicial action or by written agreement by the trustor and all beneficiaries" regardless of

(continued . . .)

primary beneficiaries. After Gary and Betty pass away, the Trust will become revocable only with the consent of a majority of the secondary beneficiaries: Matthew, Brian, and Jamie. The Trust assets, namely, the Trust real estate, may then be disbursed by being split into thirds to Matthew, Brian, and Jamie. The Trust Agreement does not authorize the trustee to self-deal[3] or provide for a means for beneficiaries to approve trustee self-dealing.

[¶7.]    The record reflects that in 2010, Matthew, in his personal capacity and as Trustee of B&B Farms Trust, obtained two loans from Legendary Loan Link, Inc. He obtained a $564,000 loan on August 16, 2010, and a $1,225,000 loan on September 16, 2010. Matthew executed mortgages on the 680 acres of property constituting the Trust property and the 560 acres he owned personally to secure these loans. The mortgages contain two signature lines for Matthew, one as Trustee for the Trust and one in his personal capacity. Matthew testified in his deposition that he used the loan funds to pay for machinery, inputs, and taxes. He

_____

(. . . continued)
   "[w]hether or not continuance of the trust on its existing terms is necessary to carry out a material purpose." SDCL 55-3-24.

2.    A spendthrift trust restricts how both a creditor and a debtor/beneficiary may interact with the trust corpus. As to creditors, a spendthrift trust is one from which "no creditor may reach present or future mandatory distributions from the trust at the trust level." SDCL 55-1-41. As to debtors, a spendthrift trust "is sufficient to restrain voluntary or involuntary alienation of a beneficial interest by a beneficiary to the maximum extent provided by law." SDCL 55-1-35.

3.    "Self-dealing occurs when an agent [the trustee, Matthew, in this case] pits their personal interests against their obligations to the principal." *Est. of Stoebner v. Huether*, 2019 S.D. 58, ¶ 19, 935 N.W.2d 262, 268 (citation omitted).

acknowledged that he personally, not the Trust, owned the machinery. There is no indication in the record that Matthew obtained the written consent of any of the Trust beneficiaries prior to encumbering Trust property with the Legendary Loan Link mortgages.

[¶8.] In 2015, Matthew sought financing from Plains Commerce Bank in his individual capacity. According to Plains Commerce, Matthew needed the financing because Legendary Loan Link had refused to provide him additional operating funds. In reviewing Matthew's financial information, Plains Commerce determined that his personal assets were not sufficient to collateralize the loan amount he was requesting (about $2,000,000). Matthew then suggested using Trust land as collateral. As Plains Commerce explained in a brief before the circuit court, it "considered Matthew's request and found a potential issue with using the Trust land as collateral, discussed it with counsel, and suggested Matthew get written consents from the other beneficiaries to obtain a mortgage." Plains Commerce contends that "[o]btaining the consent of the secondary beneficiaries was done out of an abundance of caution on the part of Plains Commerce Bank."

[¶9.] Prior to attempting to get the consents to mortgage, Matthew had attempted to obtain written consents from the beneficiaries to sell him Trust property, a plan that was abandoned. Ultimately, all primary and secondary beneficiaries were presented with and signed consents to mortgage the Trust property prior to execution of the Plains Commerce mortgage. Plains Commerce has distanced itself from these consents, stating that it "had nothing to do with the

drafting of the consent papers and was not present at the meeting when the consents were signed. Attorney Danny Smeins drafted the consent agreements."

[¶10.] In her deposition, Jamie testified that she did not learn of the existence of the Trust until October 2015 when Betty attempted to get Jamie to sign a consent for Matthew to sell Trust property. She claimed that she had attempted to get a copy of the Trust Agreement from Smeins but was unsuccessful in obtaining a copy prior to signing the consent to mortgage in November 2015. Jamie first saw a copy of the Trust Agreement sometime after January 2018. Therefore, at the time she signed the consent to mortgage, she did not know the terms of the Trust.

[¶11.] Jamie and Brian testified in their respective depositions that they understood the $800,000 worth of Trust property used as collateral for the November loan was intended to represent Matthew's one-third of the Trust Estate's value that he would receive as a secondary beneficiary upon disbursement of the Trust. At the time the mortgage against the Trust property was executed, Matthew already had a personal debt of $2,100,000. Betty stated that she did not know of Matthew's $2,100,000 debt until the day of her deposition, but she also testified to having memory issues and it is disputed whether she truly knew the amount of Matthew's debt. In regard to Jamie's knowledge of Matthew's debt, Jamie testified that prior to signing the consent to mortgage, she had an office conference with Smeins, who told her that Matthew had about $500,000 in debt and explained that such debt was the reason he was trying to get a loan from the bank.

[¶12.] On November 25, 2015, Matthew received a $1,855,000 loan from Plains Commerce Bank, using as collateral property he and his wife Kelley owned

and $800,000 worth of Trust property. Matthew signed the mortgage in his capacity as Trustee. However, the promissory note for this loan was signed by Matthew and Kelley, not Matthew as Trustee. Thereafter, Matthew and Kelley used the loan proceeds to pay off the Legendary Loan Link debts and satisfy the existing mortgages on the Trust property and Matthew's personal property associated with those debts. As a consequence of Matthew and Kelley paying off the Trust's Legendary Loan Link debts with their personal loan from Plains Commerce, there was no debt remaining on Trust assets and all debt had been transferred to Matthew and Kelley personally. However, their personal loan was partially collateralized with a mortgage on $800,000 worth of Trust property.

[¶13.] In January 2018, Matthew and Kelley defaulted on their loan obligations and Plains Commerce commenced the foreclosure action at the center of this case against Matthew and Kelley personally and Matthew in his capacity as Trustee of the B&B Farms Trust. Matthew and Kelley retained counsel for the action and filed an answer responding to the foreclosure complaint in their personal capacities on February 27, 2018. On March 21, 2018, Matthew, in his capacity as Trustee of the B&B Farms Trust, filed an answer to the foreclosure complaint, denying every allegation and reserving the right to assert affirmative defenses as the case developed.

[¶14.] Jamie, as a secondary beneficiary to the Trust, filed a motion to intervene on behalf of B&B Farms Trust on June 1, 2018, alleging that Matthew had an "irreconcilable conflict of interest between his individual capacity and trusteeship, and his efforts to protect his personal interests in this case threaten

damage to the trust." Jamie further alleged that Matthew had "engaged in an extraordinary amount of self-dealing with trust assets, particularly by encumbering the trust's real property."

[¶15.]     On June 4, 2018, the circuit court scheduled a hearing for August 10, 2018, on Jamie's motion to intervene. Prior to this hearing, on July 18, 2018, Plains Commerce moved for summary judgment on its foreclosure action against all defendants. Additionally, Plains Commerce filed an objection to Jamie's motion to intervene on August 2, 2018. On August 8, 2018, Matthew responded to Jamie's motion to intervene, stating that he did not object to Jamie's request to intervene in the case to protect her interest as a beneficiary of the B&B Farms Trust, but he did object to Jamie intervening on behalf of the Trust in place of Matthew as Trustee.

[¶16.]     On August 10, 2018, the circuit court held a hearing on both Jamie's motion to intervene and Plains Commerce's motion for summary judgment. Plains Commerce withdrew its objection to Jamie's intervention motion and its motion for summary judgment relating to the foreclosure on the Trust real estate. Matthew was called to testify during the hearing regarding Jamie's motion to intervene. Matthew testified that, as Trustee, his duties were to follow the wishes of his parents (Gary and Betty). Matthew testified that if the wishes of his parents were different from the obligations of the Trust Agreement, he would follow his parents' wishes. Matthew also admitted to commingling Trust assets with his personal

assets.[4]

[¶17.]     Through examination by counsel, Matthew introduced an exhibit purporting to be an agreement dated January 29, 2018, signed by Matthew, Betty in her personal capacity, and Betty on behalf of Gary under power of attorney. When questioned by the circuit court as to the purpose for offering this exhibit, counsel advised that this agreement was offered in response to Jamie's motion to intervene on behalf of the Trust and defend against the foreclosure action in place of Matthew to show that his actions have been consistent with his parents' wishes. Aside from a confirmation of their earlier consent to the Plains Commerce mortgage, the agreement contains recitals by Gary and Betty stating that they did not realize that the Trust was irrevocable or that the Trust did not expressly grant the Trustee the authority to self-deal; nor did they realize the ramifications of the Trust document. They further expressed that they "would prefer to revoke or modify the B&B Farms Trust and to turn all of the Trust property over to Matthew Beck, if possible" and noted that "they will consider legal options to accomplish the same."

[¶18.]     Jamie's motion to intervene was granted by the court on September 4, 2018, substituting Jamie for Matthew as Trustee "in this action[,]" and the circuit court allowed her to file an amended answer on behalf of the Trust, which she did

---

4.     The following exchange regarding commingling of assets took place during Matthew's testimony:

A:     [. . .] the trust and my personal stuff are all operated as one unit with my parents' permission.

Q:     So you were commingling trust assets with your personal assets?

A:     Yes.

on September 6, 2018. By this appointment, Jamie was directed to defend the best interests of the Trust and the beneficiaries. Dacotah Bank was named Successor Trustee in November 2018, but Jamie remains a party by intervention for purposes of this case. The circuit court also granted partial summary judgment to Plains Commerce, awarding it a judgment against Matthew and Kelley in their personal capacities. To satisfy the judgment, Plains Commerce foreclosed on all of Matthew and Kelley's real estate used to collateralize the Plains Commerce loan. Matthew and Kelley's real estate holdings in both Brown and Marshall Counties were sold for a total aggregate price of $916,120, leaving a substantial amount of the debt outstanding. Gary Beck died in September 2019.

[¶19.]    On July 9, 2020, Plains Commerce moved for summary judgment in its favor on all remaining claims in its foreclosure action. Jamie moved for summary judgment on July 10, 2020, asking the circuit court to void the mortgage as unenforceable against the B&B Farms Trust or, in the alternative, to hold the mortgage enforceable only up to an aggregate amount of $800,000 in principal plus interest. Jamie included as an exhibit in support of her motion excerpts from the deposition of the Plains Commerce employee, Lance Vilhauer, who processed Matthew and Kelley's loan and the mortgage on the Trust property. In relevant part, Lance testified:

> Q:    [. . .] Did you ever talk to any of the other beneficiaries, for instance Gary and Betty, relating to Matt seeking a $2 million ag loan from Plains Commerce?
>
> A:    No, I did not.
>
> Q:    Did Matt tell you who the beneficiaries were?

A:     I don't recall if he told me who they were.

Q:     Do you recall reviewing the trust agreement in this situation?

A:     I recall reviewing it.  I recall reviewing it.

Q:     Okay.  Did you notice any red flags with the trust agreement that would have impacted your decision to lend money using the trust land as collateral?

A:     You mentioned red flags?

Q:     Yeah.

A:     The red flags were - - the potential red flags were brought to my attention from our counsel.

Q:     Okay.  What was your understanding of what the red flags are with relationship to this trust agreement?

A:     It dealt with Matt as the trustee—it dealt with Matt as the trustee to make sure he was not self-dealing.

Q:     So your understanding was Matt could not self-deal under the trust agreement?

A:     Correct.

Q:     Okay.  And again, your understanding of self-dealing is that a trustee has to take - - before a trustee can benefit personally from the trust, he has to take certain steps to make that acceptable, is that your understanding then?

A:     To notify all beneficiaries, correct.

Q:     Oh, he just has to give notice?

A:     I would say notice and approval.

Q:     Okay.

A:     From the beneficiaries.

Q:     You mentioned that Matt could not self-deal was one of the flags as you understood it.  Were there any others?

A:      No, not that I can recall.

Q:      Okay.  Do you know whether it was an irrevocable trust or a revocable trust?

A:      I believe it was noted that this is an irrevocable trust.  I would have to double-check, but I think that's what it is.

Q:      Okay.  Did you have any awareness of a spendthrift clause in this trust?

A:      I don't know what that is.

[¶20.]      On December 22, 2020, the circuit court granted Jamie's motion for summary judgment on behalf of the Trust, denied Plains Commerce's motion for summary judgment, and dismissed Plains Commerce's claims against the Trust with prejudice.  The circuit court held that:

> [T]he mortgage and guaranty entered into by Matthew Beck as trustee of the Trust were void and unenforceable from the moment they were signed, and that any right, claim, or interest claimed by Plaintiff in the Trust's property arising out of the mortgage and guaranty signed by Trustee Mat[t]hew Beck are likewise void and unenforceable from the moment they were signed[.]

The circuit court additionally ordered that Plains Commerce pay Jamie's statutory court costs in the amount of $2,620.65.

[¶21.]      On December 30, 2020, Jamie moved the court for attorney fees in the amount of $33,744.53.  On December 31, 2020, the court entered an order reassigning the case to another circuit judge.[5]  Plains Commerce filed its notice of

---

5.      The Honorable Scott P. Myren was appointed to the South Dakota Supreme Court on October 28, 2020, and assumed office on January 5, 2021.  Prior to his change in judicial duties, he exercised his authority as presiding judge for the Fifth Judicial Circuit to appoint the Honorable Richard Sommers to serve as the judge for the case.

appeal on January 12, 2021, from the order granting summary judgment. Plains Commerce filed its brief in opposition to Jamie's motion for attorney fees on January 25, 2021. The circuit court held a hearing on the matter of attorney fees on February 4, 2021. On February 17, 2021, the circuit court entered its findings of fact and conclusions of law granting Jamie's revised request for attorney fees in the amount of $33,364.85. Because Plains Commerce had already filed its notice of appeal, the attorney fees order was stayed by court order pending resolution of the summary judgment appeal. Plains Commerce subsequently filed a notice of appeal on the matter of attorney fees on February 25, 2021. We consolidate both appeals.

[¶22.]     Plains Commerce raises multiple issues which we restate as follows:

1.     Whether Matthew had authority under the Trust Agreement or from the consents signed by the beneficiaries to mortgage Trust property to obtain a personal loan.

2.     Whether the signed consents altered the Trust Agreement.

3.     Whether Plains Commerce could rely on the Certificate of Trust as authority for Matthew to mortgage Trust property to obtain a personal loan.

4.     Whether § 4.1 of the Trust Agreement authorized Matthew, in his capacity as Trustee, to mortgage Trust property if the loan proceeds were partially used to satisfy Trust debt.

5.     Whether the circuit court erred in awarding attorney fees to Jamie as Intervenor for the trust.

**Standard of Review**

[¶23.]     "We review an order granting summary judgment de novo and determine 'whether there were any genuine issues of material fact and whether the

-12-

moving party was entitled to judgment as a matter of law.'" *In re Matheny Fam. Tr.*, 2015 S.D. 5, ¶ 7, 859 N.W.2d 609, 611 (citation omitted). On review, "[t]he evidence must be viewed most favorably to the nonmoving party and reasonable doubts should be resolved against the moving party. . . . If there exists any basis which supports the ruling of the trial court, affirmance of a summary judgment is proper." *Kirlin v. Halverson*, 2008 S.D. 107, ¶ 10, 758 N.W.2d 436, 443 (citation omitted). In a foreclosure action, the circuit court's award of attorney fees is "reviewed for abuse of discretion." *Adrian v. McKinnie*, 2004 S.D. 84, ¶ 6, 684 N.W.2d 91, 94. An abuse of discretion occurs when there is "a fundamental error of judgment, a choice outside the range of permissible choices, a decision, which, on full consideration, is arbitrary or unreasonable." *Arneson v. Arneson*, 2003 S.D. 125, ¶ 14, 670 N.W.2d 904, 910.

**Analysis and Decision**

1. ***Whether Matthew had authority under the Trust Agreement or from the consents signed by the beneficiaries to mortgage Trust property to obtain a personal loan.***

[¶24.] Plains Commerce asserts that the circuit court erred in concluding that Matthew could not, under the Trust Agreement, mortgage Trust property to obtain a personal loan when, as here, he obtained written consent from the primary beneficiaries, Gary and Betty, to mortgage his one-third future interest in the trust assets. Plains Commerce recognizes that the Trust Agreement contains a spendthrift provision prohibiting a beneficiary from encumbering trust assets. However, Plains Commerce claims that, despite this provision, § 6.2 of the Trust Agreement authorized Gary and Betty to expand Matthew's existing power under

§ 4.1 "to secure debts of the Trust or debt secured by real estate at the time of the creation of the Trust" to include the power to mortgage Trust property to obtain a personal loan, so long as Gary and Betty provide unanimous written consent.

[¶25.] In response, Jamie asserts that the spendthrift provision "broadly and unequivocally forbids making the Trust Estate liable" for a beneficiary's personal debts and "prohibits a beneficiary from, generally, encumbering or disposing of his interest prior to its distribution." Jamie further asserts that although there is an exception in the spendthrift provision allowing the beneficiary to encumber an interest in the Trust Estate "by power of appointment or withdrawal expressly granted hereunder[,]" the exception does not apply here because nothing in the Trust Agreement itself grants such power of appointment or withdrawal to Matthew. Finally, Jamie claims that when § 6.2, which enabled Gary and Betty to authorize the Trustee to sell, option, or dispose of interests in the real estate, is read in harmony with the spendthrift provision, Matthew was not authorized to mortgage Trust property for a personal loan.

[¶26.] The interpretation of a trust instrument "is a question of law reviewed de novo." *In re Est. of Long*, 2014 S.D. 26, ¶ 31, 846 N.W.2d 782, 788 (citation omitted). "When interpreting a trust instrument, we must 'ensure that the intentions and wishes of the [settlor] are honored.'" *Id.* (alteration in original) (quoting *In re Sunray Holdings Tr.*, 2013 S.D. 89, ¶ 14, 841 N.W.2d 271, 274). To do so, we first "look to the language of the trust instrument[,]" and "[i]f the language of the trust instrument makes the intention of the [settlor] clear, it is our duty to

declare and enforce it." *Id.* (alteration in original) (quoting *Sunray Holdings*, 2013 S.D. 89, ¶ 14, 841 N.W.2d at 274).

[¶27.]        Here, a review of the language of the Trust Agreement does not support Plains Commerce's contention that Matthew had authority to mortgage Trust property for a personal loan. It is undisputed from the evidence in the record that Matthew's use of $800,000 in Trust property as collateral for the November loan represented the predicted one-third share he would inherit as a beneficiary upon disbursement.[6] Yet, the spendthrift provision unambiguously bars beneficiaries from encumbering Trust property for personal debt. That provision states under Article VIII:

> PROTECTION OF TRUST FUND[:] No title in or to any Trust fund created under this Agreement shall vest in any beneficiary, and neither the principal nor the income of the Trust Estate shall be liable for the debts of any beneficiary, and *no beneficiary* shall have any power to transfer, *encumber or in any manner, other than by power of appointment or withdrawal expressly granted hereunder, to anticipate or dispose of his or her interest* in any Trust Estate hereunder, or the income produced thereby, prior to the actual distribution thereof by the Trustee to such beneficiary.

(Emphasis added.)

[¶28.]        Moreover, contrary to Plains Commerce's view, § 6.2 does not invoke the exception to the spendthrift provision allowing a *beneficiary* to encumber his or her interest in a trust "by power of appointment or withdrawal *expressly granted hereunder*." (Emphasis added.) Article VI is titled, "Trustee's powers as to sale of

---

6.        Attorney Smeins came up with the $800,000 amount by estimating that the Trust assets were worth $2,400,000 and roughly dividing that amount into thirds.

real estate[,]" and § 6.2 provides that "[t]he Trustee is not authorized *to sell, option or dispose of any interest* in the real estate during the lifetime of GARY J. BECK except upon the unanimous written consent of both the primary beneficiaries." Notably, Matthew did not sell Trust property—he mortgaged it. And, more significantly, even if the word "dispose," when read in isolation, includes mortgaging property, when the term is viewed in light of the Trust Agreement as a whole, there is a more specific provision placing limits on the Trustee's power to mortgage Trust property in § 4.1. As the circuit court noted, "[t]he specific provision limiting the Trustee's ability to mortgage trust property cannot be made meaningless by a less specific provision that by its terms relates to the sale of trust property."

[¶29.]    Even if § 6.2 was intended to authorize the Trustee to mortgage Trust real estate upon the written consent of Gary and Betty, nothing in § 6.2 evinces an express grant of power to a *beneficiary* to encumber or otherwise dispose of an interest in the Trust real estate to secure a personal loan. By its plain terms, § 6.2 authorizes Matthew, *as the Trustee*, to sell, option, or dispose of an interest in real estate during Gary's lifetime upon Gary and Betty's written consent. Thus, this provision only authorizes Matthew, as the Trustee, to exercise his fiduciary duties with respect to Trust property and does not provide Matthew authority to mortgage his beneficial one-third future interest in the Trust to secure a personal loan.

[¶30.]    Plains Commerce nevertheless contends that because all the primary and secondary beneficiaries signed the consents to mortgage, Matthew, as Trustee, was authorized to self-deal by mortgaging his future interest in Trust property to

secure a personal loan, notwithstanding the spendthrift provision. Plains Commerce recognizes that a trustee generally does not have authority to self-deal unless the trust contains "clear and unmistakable language" authorizing such self-dealing. *See In re Est. of Stevenson*, 2000 S.D. 24, ¶ 15, 605 N.W.2d 818, 822. However, Plains Commerce relies on the exception to this rule in SDCL 55-2-3(1) that allows a trustee to self-deal "[w]hen the beneficiary does have the capacity to contract and, with a full knowledge of the motives of the trustee and of all other facts concerning the transaction which might affect his own decision and without the use of any influence on the part of the trustee, permits the trustee to do so[.]"

[¶31.] The problem with Plains Commerce's argument is that Matthew is also a beneficiary and the spendthrift provision specifically requires that a beneficiary's power to encumber the Trust property be expressly granted in the Trust Agreement. Thus, while it is true that SDCL 55-2-3(1) provides an avenue for a *trustee* to engage in self-dealing when such is not clearly and unmistakably authorized by the trust document, the statute does not authorize a *beneficiary* to encumber an anticipated interest in a spendthrift trust. Self-dealing by a trustee and a beneficiary encumbering an anticipated future interest in a trust are not synonymous actions, and spendthrift provisions, like the one here, limit the type of self-dealing transactions by a trustee who is also a beneficiary that might otherwise be authorized under the statute.

[¶32.] Importantly, to allow, as Plains Commerce suggests, written permission in a document outside the Trust Agreement to override the spendthrift provision would eviscerate the "formidable barriers" the Legislature has placed

-17-

"between creditor claims and trust funds protected by a spendthrift provision." *See In re Cleopatra Cameron Gift Tr.*, 2019 S.D. 35, ¶ 26, 931 N.W.2d 244, 251. Those barriers are codified in SDCL chapter 55-1. For example, when a "trust contains a spendthrift provision, no creditor may reach present or future mandatory distributions from the trust at the trust level." SDCL 55-1-41. Further, spendthrift provisions are "sufficient to restrain voluntary or involuntary alienation of a beneficial interest by a beneficiary to the maximum extent provided by law." SDCL 55-1-35. They apply "to both distribution interests and remainder interests" and constitute "a material provision of a trust." SDCL 55-1-37.

[¶33.]      The spendthrift provision in the Trust Agreement embodies these principles, and Plains Commerce has not directed this Court to any authority supporting its claim that the self-dealing exception for trustees in SDCL 55-2-3(1) can override the spendthrift provision in this Trust Agreement or the formidable barriers in SDCL chapter 55-1.[7] Therefore, the circuit court did not err when it concluded as a matter of law that Matthew did not have authority, under the Trust Agreement or from the consents to mortgage, to mortgage Trust property to obtain a

---

7.      The dissent recognizes the formidable barrier a spendthrift provision creates. However, in the dissent's view, all interested parties could, under SDCL 55-1-53, vary "the spendthrift provision as it related solely to Plains Commerce" by executing the consents to mortgage. *Infra* ¶ 79. That statute provides: "[t]he terms of a *governing instrument* may expand, restrict, eliminate, or otherwise vary any provisions of *general application to trusts and trust administration*." SDCL 55-1-53 (emphasis added). Even if we set aside the fact that no language in the consents to mortgage at issue here seeks to modify the spendthrift provision, it is apparent that SDCL 55-1-53 is not implicated in this case. This statute authorizes the trust instrument to vary the general provisions that would otherwise apply to all trusts and trust administration. It does not provide an avenue for beneficiaries to vary provisions in a trust agreement by written consent.

personal loan. Because of our resolution of this issue, we need not decide whether the consents satisfied the requirements of SDCL 55-2-3(1).

### 2. Whether the signed consents altered the Trust Agreement.

[¶34.] Alternatively, Plains Commerce asserts that the consents signed by the beneficiaries altered the Trust Agreement, including the spendthrift provision, such that Matthew could "secure his debts with an $800,000 mortgage on Trust property." Plains Commerce directs this Court to the language in Article III of the Trust Agreement providing that the Trust may be "altered or amended by Grantors" during Gary's lifetime with "unanimous consent of the primary and secondary beneficiaries[.]" In its view, because the language of Article III allows the Trust to be altered upon unanimous consent, the grantors and beneficiaries could, via the consents, change the Trust to allow Matthew to "secure his debts with an $800,000 mortgage on Trust property[.]"

[¶35.] A review of the consents to mortgage does not support that the primary and secondary beneficiaries consented to altering the Trust Agreement.[8] The consents at issue state:

> I, the undersigned, a secondary beneficiary of the B&B Farms Trust u/t/a dated November 1, 1999, hereby consent to the Trustee mortgaging or encumbering the following real estate to Plains Commerce Bank, Aberdeen, South Dakota:

---

8.  The dissent suggests that whether the consents to mortgage altered the provisions of the Trust is a question of fact. On the contrary, the validity of an effort to change a trust instrument does not turn on the subjective intent of those who signed the consent documents, but rather on the legal sufficiency of the consent documents themselves. Our interpretation of the consents, therefore, is a legal question as it generally would be for matters involving the interpretation of text.

[legal description of real estate]
I am aware and understand that the Trustee has authority or discretion to mortgage or encumber the trust property, however the proposed mortgage to Plains Commerce Bank benefits the Trustee and not all trust beneficiaries. This document confirms my consent to the mortgage of the real estate by Trustee and secondary beneficiary, Matthew Beck. This consent is limited to the current proposed mortgage and any future mortgages not to exceed $800,000.00. This is not a consent to additional or new loans and encumbrances, except as stated herein and except for extensions of the note and mortgages up to the limits set forth herein.

[¶36.] By its express terms, the consents applied only to a single transaction—not to the Trust Agreement itself. Indeed, noticeably absent is any language indicating that the *Grantors* intended to alter the Trust Agreement or more specifically that the Grantors intended to alter the spendthrift provision. While all the beneficiaries signed the consents to mortgage, it cannot be said that they unanimously consented to an *alteration* of the Trust Agreement. Rather, it is apparent from the language of the consents to mortgage that the beneficiaries consented to a specific transaction between Matthew and Plains Commerce involving a mortgage not to exceed $800,000 on real estate owned by the Trust.[9] Because there is no language in the written consents to support Plains Commerce's claim that the grantors and beneficiaries altered the Trust Agreement, the circuit

---

9. Notably, the agreement signed in the course of the litigation by Gary through Betty as his POA, Betty, and Matthew in January 2018 and offered to the circuit court as an exhibit, seems to acknowledge that the existing consents did not operate to modify the Trust Agreement. The agreement specifically refers to the "ramifications of the Trust document" and that Gary and Betty "would prefer" to modify the Trust and would "consider legal options to accomplish the same."

court properly concluded that the consents to mortgage did not authorize Matthew to mortgage Trust property for his personal loan.

> **3. Whether Plains Commerce could rely on the Certificate of Trust as authority for Matthew to mortgage Trust property.**

[¶37.] Plains Commerce notes that it was provided a Certificate of Trust prepared by Attorney Smeins that identified Matthew as the Trustee and provided that the Trustee "possesses the entirety of the powers granted by [statute] which indicates as to real estate the power to lease, mortgage, enter contracts, etc." In Plains Commerce's view, although it had a copy of the actual Trust Agreement, it could rely on the Certificate of Trust to enforce the transaction because it acted in good faith in entering into the transaction with Matthew. *See* SDCL 55-4-54 (providing that "[a]ny person who in good faith enters into a transaction in reliance on a certificate of trust may enforce the transaction against the trust property as if the representations contained in the certification were correct").

[¶38.] Under SDCL 55-4-51, a trustee may, instead of furnishing the trust instrument or a copy thereof to a person who is not a beneficiary of the trust, furnish a "certificate of trust" containing, among other required information, the applicable powers of the trustee set forth in the instrument, "including those powers authorizing the trustee to sell, convey, pledge, mortgage, lease, or transfer title to any interest in property held in the trust[.]" "[A] certificate of trust is conclusive proof as to the matters contained in it and any party may rely upon the certificate, *except a party who has actual knowledge of the facts to the contrary*." SDCL 55-4-51.1 (emphasis added). Although, as Plains Commerce notes, "[k]nowledge of the

-21-

terms of the trust may not be inferred solely from the fact that a copy of all or part of the trust instrument is held by the person relying on the certification," *see* SDCL 55-4-53, here, the undisputed evidence in the record shows that Plains Commerce had actual knowledge that the Trust Agreement did not allow Matthew, as the Trustee, to mortgage Trust property to secure his personal debt. Plains Commerce acknowledges that it reviewed the Trust Agreement and had its legal counsel review the Trust Agreement prior to entering into the transaction with Matthew. And as the circuit court noted, Plains Commerce's knowledge that the Trust Agreement did not authorize the transaction at issue was apparent given its "efforts to create such authority through the execution of the purported consents." In light of this undisputed evidence, the circuit court properly determined that Plains Commerce could not, under SDCL 55-4-54, seek to enforce Matthew's personal mortgage "against the trust property as if the representations contained in the certification were correct."[10]

---

10. The dissent offers a policy argument for why the nature of transactions between commercial lenders and family-farm trusts warrants a different result in this case. Respectfully, however, our decision is and must be based on the controlling provisions of the Trust Agreement and applicable trust laws. Moreover, this Court's ruling does not mean, as the dissent suggests, that "no matter what reasonable legal efforts" commercial lenders undertake to extend a line of credit, "its efforts will be highly suspect." *Infra* ¶ 82. On the contrary, governing trust instruments can allow for alterations. In fact, here, Article III of the Trust Agreement did allow for alterations to be made with the consent of all the beneficiaries. But for the reasons explained in this opinion, the language of the consents at issue did not alter the provisions of the Trust Agreement.

> ### 4. Whether § 4.1 of the Trust Agreement authorized Matthew, in his capacity as Trustee, to mortgage Trust property if the loan proceeds were partially used to satisfy Trust debt.

[¶39.]     Plains Commerce further argues that § 4.1 of the Trust Agreement authorized Matthew to mortgage the Trust property under the circumstances here. This provision provides:

> Grantors acknowledge that the real estate assets to be made part of the Trust *may be mortgaged to secure debts of the Trust or debt secured by real estate at the time of creation of the Trust.* It is understood by the Grantors that the Trustee shall apply as much of the income of the Trust Estate to the retirement of this debt as he deems prudent, and the retirement of the debt is to be given priority over income distributions to the beneficiaries of the Trust.

(Emphasis added.)

[¶40.]     During the summary judgment hearing, the circuit court asked counsel for Plains Commerce whether "there is a factual dispute over whether the money Matthew was securing by the mortgage was debt of the estate." Counsel did not identify evidence in the record supporting that the mortgage at issue secured a debt of the Trust. Rather, counsel replied, "I don't think there is a material factual dispute that should preclude summary judgment." Ultimately, the circuit court determined that "[t]here is no legitimate factual dispute that the loan secured by Matthew was not a debt that fell within either of those two [italicized] categories."

[¶41.]     On appeal, Plains Commerce appears to acknowledge that Matthew and Kelley's promissory note, secured in part by the $800,000 mortgage on Trust property, cannot be characterized as a debt of the Trust. However, in Plains Commerce's view, § 4.1 authorized the mortgage here because at the time the Trust

was created, "there was still farm debt" and the loan to Matthew and Kelley "was used, in part, to satisfy debt which existed when the Trust was created." In particular, Plains Commerce directs this Court to deposition testimony by Betty, Matthew, and Brian wherein they each claimed that debt existed at the time the Trust was created, and to Lance Vilhauer's testimony that when Matthew requested the loan from Plains Commerce, Matthew told him that a large portion of the existing debt related to his parents' debt.

[¶42.]        Even accepting this conclusory testimony that debt existed on Trust assets at the time the Trust was created in 1999, the parties do not dispute that the debt *secured* by Plains Commerce's mortgage was not a debt of the Trust or a debt that was secured by Trust property at the time of the creation of the Trust. By its own terms, Plains Commerce's 2015 mortgage only secured Matthew and Kelley's personal debts. The Plains Commerce mortgage specifically defines the "Secured Debts" as the $1,855,000 promissory note signed by Matthew and Kelley and "[a]ll present and future debts" from Matthew and Kelley to Plains Commerce. Regardless of whether Matthew commingled his personal assets and debts with those of the Trust and used some of the *proceeds* of his personal loan to pay off debts of the Trust, it is undisputed by virtue of the plain language of the mortgage at issue that it did not secure debts of the Trust. Therefore, the circuit court properly concluded that § 4.1 does not apply to Matthew's actions.

[¶43.]        In conclusion, Plains Commerce Bank offered Matthew Beck a personal loan using as partial collateral a mortgage on $800,000 worth of land belonging to an irrevocable spendthrift trust of which Matthew was both the trustee

and a secondary beneficiary. Although Plains Commerce required Matthew to secure written consents to the mortgage from all primary and secondary trust beneficiaries in an attempt to avoid the inherent self-dealing conflict that arises when a trustee mortgages trust land for personal benefit, the consents did not override the formidable spendthrift provision in this Trust and did not alter the Trust Agreement. Also, because Plains Commerce had actual knowledge that Matthew did not have authority under the Trust Agreement to mortgage Trust property to obtain a personal loan, it could not rely on the Certificate of Trust as authority for Matthew to do so. Finally, § 4.1 of the Trust does not apply under the circumstances here because the mortgage at issue did not secure debts of the Trust. We, therefore, conclude that the circuit court properly granted Jamie's motion for summary judgment and dismissed Plains Commerce's claims against the Trust. For these reasons, we affirm.

[¶44.]    JENSEN, Chief Justice, and SALTER and DEVANEY, Justices, concur on Issues 1 through 4.

[¶45.]    ZELL, Retired Circuit Court Judge, dissents on Issues 1 through 4.

**[¶46.]    SALTER, Justice, writing for the Court on Issue 5.**

> **5.    *Whether the circuit court erred in awarding attorney fees to Jamie as Intervenor for the trust.***

[¶47.]    A court must have specific authority to depart from what is commonly known as the "American Rule" under which the parties pay their own attorney fees. *Rupert v. City of Rapid City*, 2013 S.D. 13, ¶ 32, 827 N.W.2d 55, 67. This authority could come from a contractual right or attorney fees could be specifically authorized by statute. *Id.*

[¶48.]     Here, the latter type is implicated as Plains Commerce challenges the circuit court's decision to grant Jamie's request for attorney fees pursuant to SDCL 15-17-38.  The relevant text of the statute provides:

> [A]ttorneys' fees may be taxed as disbursements if allowed by specific statute.  The court, if appropriate, in the interests of justice, may award payment of attorneys' fees in all cases of divorce, annulment of marriage, determination of paternity, custody, visitation, separate maintenance, support, or alimony.  The court may award attorneys' fees from trusts administered through the court as well as in probate and guardianship proceedings.  *Attorneys' fees may be taxed as disbursements on mortgage foreclosures either by action or by advertisement.*

(Emphasis added.)

[¶49.]     Plains Commerce argues that because the case effectively lost its identity as a mortgage foreclosure action, the provisions of SDCL 15-17-38 do not permit an award of attorney fees.  Jamie contends that the action remains a foreclosure action.  Citing our decision in *Kimball Inv. Land, Ltd. v. Chmela*, 2000 S.D. 6, 604 N.W.2d 289, Jamie argues that SDCL 15-17-38 "clearly grants power to authorize attorney's fees in mortgage foreclosure actions[.]"

[¶50.]     But we did not go so far in *Kimball Inv. Land.*  Instead, we stated only that "[SDCL 15-17-38] is specific statutory authorization for an award of attorneys' fees in *mortgage foreclosures* and provides the authorization for the circuit court's award of attorney's fees[.]"  2000 S.D. 6, ¶ 24, 604 N.W.2d 289, 296 (emphasis added).  Then, using an uncomplicated reading of SDCL 15-17-38, we determined that a non-regulated creditor which had obtained summary judgment in its action to foreclose on the debtor's property was eligible for an award of attorney fees.

[¶51.]    However, Jamie is not the party seeking foreclosure, and she did not, of course, obtain foreclosure relief.  So, to determine whether SDCL 15-17-38 authorized an award of attorney fees here requires a closer reading of the statute, which ultimately leads us to accept Plains Commerce's view, though for different reasons.

[¶52.]    Leaving aside the last sentence of SDCL 15-17-38 concerning mortgage foreclosures, other provisions within the statute authorize attorney fees in three different types of civil actions.  In each instance, the Legislature took care to expressly denominate the class of cases for which a court could award attorney fees.  For instance, SDCL 15-17-38 allows a court to award attorney fees in certain kinds of family law "*cases.*"  Also, in certain types of trust cases, judges may allow attorney fees "from *trusts administered through the court.*"  *Id.* (emphasis added).  And finally, a court may grant attorney fees in "probate and guardianship *proceedings.*"  *Id.* (emphasis added).

[¶53.]    But the clause relating to mortgage foreclosures is much different because SDCL 15-17-38 does not authorize attorney fees *in foreclosure actions*; it authorizes them *on mortgage foreclosures* by action or by advertisement.  (Emphasis added.)  In other words, attorney fees are permitted when there is *a foreclosure*— not simply when there is a *foreclosure action*, as suggested by Jamie.  The idea that the Legislature did not allow for attorney fees within the broader class of foreclosure cases—just the foreclosure relief itself—highlights a distinction illustrated elsewhere in our Code.

[¶54.]     Indeed, several sections of the general foreclosure remedy provided in SDCL chapter 21-47 distinguish between the foreclosure action and the foreclosure remedy by referring to an action, or actions, for foreclosure. *See, e.g.*, SDCL 21-47-1 (describing venue in "[a]ctions for the foreclosure or satisfaction of mortgages"); SDCL 21-47-4 (requiring the complaint "[i]n an action for the foreclosure or satisfaction of a mortgage" disclose prior collection efforts). The term "foreclosure" is used in other chapter 21-47 statutes to describe the result of the action or the relief obtained by the action. *See, e.g.,* SDCL 21-47-17 (". . . a foreclosure by action of a mortgage upon real estate operates as a complete extinguishment, satisfaction and payment of the debt secured by the mortgage. . . ."); SDCL 21-47-13 ("Whenever an action shall be brought for the foreclosure or satisfaction of a mortgage, the court shall have power to render a judgment against the mortgagor for the amount of the mortgage debt due at the time of the rendition of such judgment, and the costs of the action, and to order and decree a sale of the mortgaged premises . . .").

[¶55.]     Perhaps even more compelling is the fact that the foreclosure relief referenced in SDCL 15-17-38 need not be part of a mortgage foreclosure action at all. The foreclosure could, as the statute's text states, be obtained "by advertisement." *See* SDCL ch. 21-48 ("Foreclosure of Real Property Mortgage by Advertisement"). In fact, SDCL 21-48-4 expressly conditions relief upon there being *no action*:

> To entitle any party to foreclose by advertisement, it shall be necessary that *no action or proceeding shall have been instituted at law* to recover the debt then remaining secured by such mortgage, or any part thereof; or, if any action or proceeding has been instituted, that the same has been discontinued, or that an

execution upon the judgment rendered therein has been returned unsatisfied, in whole or in part.

(Emphasis added); *see also* SDCL 21-48-9 (authorizing a mortgagor subject to foreclosure by advertisement to seek foreclosure by action).

[¶56.] Further, SDCL 21-48-15 makes clear that "the *party foreclosing a mortgage* by advertisement shall be entitled to his costs and disbursements, including any attorney fees allowed by law, out of the proceeds of the sale." (Emphasis added.) There is no authority within chapter 21-48 that contemplates taxing attorney fees as a disbursement for any party other than a mortgagee.

[¶57.] Consequently, the fact that this case traces its origin to a foreclosure action has no impact upon the application of SDCL 15-17-38 here. Because there was no mortgage foreclosure, the statutory provision authorizing attorney fees "on foreclosure" does not apply. We, therefore, reverse the circuit court's fee award.

[¶58.] JENSEN, Chief Justice, and DEVANEY, Justice, and ZELL, Retired Circuit Court Judge, concur on Issue 5.

[¶59.] KERN, Justice, dissents on Issue 5.

[¶60.] KERN, Justice (dissenting on Issue 5).

[¶61.] The majority asserts a position, albeit not one raised or briefed by the parties, that the text of SDCL 15-17-38 authorizes an award of attorney fees only to a mortgagee who has successfully prosecuted a mortgage foreclosure action. The majority's position, however, relies on an unnecessarily complicated reading of SDCL 15-17-38. *Supra* ¶ 48. Therefore, I respectfully, dissent.

[¶62.]     Succinctly stated, the question becomes: how should foreclosure be properly defined? Does it refer to a foreclosed mortgage or the proceeding initiated to foreclose a mortgage? The majority reasons that SDCL 15-17-38 does not authorize fees in foreclosure actions but rather "on mortgage foreclosures by action or by advertisement," concluding that this language permits fees only when the movant has successfully prosecuted a foreclosure action. *Supra* ¶ 53. Unlike the laws of other jurisdictions, South Dakota's law does not take care to define the precise meaning of foreclosure. *See, e.g.*, 735 Ill. Comp. Stat. Ann. 5/15-1203 (2022) (defining "foreclosure" as the proceedings and not the resolution and "to foreclose" as "to terminate legal and equitable interests in real estate pursuant to a foreclosure"). As one court aptly explained, "[t]he term 'foreclosure' commonly means different things depending on the context in which it appears. Sometimes people use the word 'foreclosure' to mean the foreclosure sale itself, which is the event that terminates or 'forecloses' someone's rights to property. The word can also reasonably mean the process leading up to that sale." *Hiscox Dedicated Corp. Member v. Taylor*, 53 F.4th 437, 440 (8th Cir. 2022); *Provident Bank v. Tenn. Farmers Mut. Ins. Co.*, 234 Fed. Appx 393, 396–97 (6th Cir. 2007) (unpublished). Another court looked to Black's Law Dictionary to define "foreclosure" as "[a] legal proceeding." *Waste Mgmt. of Nev. v. West Taylor St., LLC*, 443 P.3d 1115, 1117 (Nev. 2019).

[¶63.]     In addition to "foreclosure" having no clear meaning, SDCL 15-17-38's remaining language does not clearly indicate the Legislature's intent to limit an award of attorney fees to a mortgagee who has foreclosed on a mortgage. As this

Court has said, "[a] statute or portion thereof is 'ambiguous' when it is capable of being understood by reasonably well-informed persons in either of two or more senses." *Wheeler v. Cinna Bakers LLC*, 2015 S.D. 25, ¶ 6, 864 N.W.2d 17, 20 (citation omitted), *superseded by statute on other grounds*, SDCL 62-1-23.

[¶64.]     This ambiguity must be resolved through statutory interpretation. "In construing a statute, our purpose is to discover the true intention of the law and that intention must be ascertained primarily from the language expressed in the statute." *State v. Ventling*, 452 N.W.2d 123, 125 (S.D. 1990) (citation omitted). "The intent of the law must be derived from the statute as a whole and by giving the statutory language its plain, ordinary and popular meaning." *Id.* (citation omitted). We may use the statute's surrounding text and "dictionary definitions to determine the plain and ordinary meaning of undefined words." *Jackson v. Canyon Place Homeowner's Ass'n*, 2007 S.D. 37, ¶ 11, 731 N.W.2d 210, 213 (citing *Halls v. White*, 2006 S.D. 47, ¶ 8, 715 N.W.2d 577, 581); *see Divich v. Divich*, 2002 S.D. 24, ¶ 12, 640 N.W.2d 758, 762.

[¶65.]     Here, SDCL 15-17-38's text refers to *actions*, *cases*, and *proceedings*—not final results. In its first sentence, SDCL 15-17-38 allows for the recovery of attorney fees, when it is agreed upon by the parties, in all "*actions* and special *proceedings*[,]" irrespective of result. (Emphasis added.) Likewise, the third sentence permits recovery "in all *cases* of divorce, annulment of marriage, determination of paternity, custody, visitation, separate maintenance, support, or alimony[,]" again, irrespective of result. (Emphasis added.) And the fourth sentence allows recovery in all "probate and guardianship *proceedings*." (Emphasis

added.)  It is within this framework that the final sentence providing that "[a]ttorneys' fees may be taxed as disbursements on mortgage foreclosures either by action or by advertisement" must be viewed—with a focus on the proceeding, not the result.

[¶66.]    By reading SDCL 15-17-38's last sentence to require a recovering party to have successfully foreclosed on a mortgage, the majority introduces a condition that does not exist in the statute's text—an interpretation this Court is not free to make.  "A court is not at liberty to read into the statute provisions which the [L]egislature did not incorporate[.]"  *City of Deadwood v. M.R. Gustafson Fam. Tr.*, 2010 S.D. 5, ¶ 9, 777 N.W.2d 628, 632 (alteration in original) (holding that a court may not "add an additional requirement that is not found in the statute").  Had the Legislature wanted to condition attorney fees on the plaintiff obtaining a favorable result, it could have done so with language similar to what it used in SDCL 15-17-8,[11] now repealed, providing in pertinent part that "[i]n all actions commenced *and prosecuted to judgment* in the circuit court for the foreclosure of any chattel or real

---

11.    In its entirety, SDCL 15-17-8 provided:

> In all actions commenced and prosecuted to judgment in the circuit court for the foreclosure of any chattel or real estate mortgage the plaintiff in such action shall be allowed an attorney fee as follows: on the first one hundred dollars or under of such judgment, ten dollars, and three per cent on each dollar of judgment in excess of one hundred dollars and not exceeding five hundred dollars. Such attorney fee in no case shall exceed the sum of twenty-five dollars unless the court shall by order allow an additional sum when issue has been joined in such action. If the plaintiff shall fail to recover in such action, the defendant in such action shall be allowed an attorney fee not exceeding twenty-five dollars.

estate mortgage the *plaintiff* in such action shall be allowed an attorney fee. . . ." (Emphasis added.) *See First Federal Sav. And Loan Ass'n of Rapid City v. Clark Inv. Co.*, 322 N.W.2d 258, 261 n.7 (S.D. 1982) (citing SDCL 15-17-8, *repealed by* 1992 S.D. Sess. Laws ch. 148, § 26).[12] Likewise, SDCL 15-17-8's limit on the amount of attorney fees a court may award illustrates the Legislature's ability to circumscribe an award of attorney fees on foreclosure actions if that was its intention. In addition, the statute's final line, which provides, "[i]f the plaintiff shall fail to recover in such action, the defendant in such action shall be allowed an attorney fee not exceeding twenty-five dollars," exemplifies how the Legislature has historically allowed an award of attorney fees on foreclosure actions to successful mortgagors. *See* SDCL 15-17-8, *repealed by* 1992 S.D. Sess. Laws ch. 148, § 26.

[¶67.] By repealing SDCL 15-17-8 and enacting SDCL 15-17-38 in its stead, the Legislature did not limit SDCL 15-17-38's award of attorney fees to mortgagees only. Had the Legislature intended to restrict the scope of attorney fees awardable on foreclosure actions, SDCL 15-17-8 demonstrates that the Legislature knew exactly how to do so. *See Wheeler v. Farmers Mut'l Ins. Co.*, 2012 S.D. 83, ¶ 24, 824 N.W.2d 102, 109 (noting that the Legislature's exclusion of certain language with knowledge of such language warrants not reading the language into the statute). As this Court has said, we "must assume that the Legislature meant what the statute says." *Beers v. Pennington Cnty.*, 2000 S.D. 107, ¶ 10, 616 N.W.2d 79, 82.

---

12. As noted by the majority, *supra* ¶ 56, the Legislature took the trouble to provide such specificity in SDCL 21-48-15, where it limited attorneys' fees in foreclosures by advertisements to "the party foreclosing a mortgage by advertisement[.]" Yet the Legislature wrote no such limitation into SDCL chapter 21-47, the statutory chapter directly regulating foreclosure actions.

And here, SDCL 15-17-38 provides more discretion in awarding attorney fees than its predecessor—not less.

[¶68.]    Accordingly, the language in SDCL 15-17-38 allowing for the recovery of attorney fees on mortgage foreclosures is more appropriately read in uniformity with the sentences that proceed it—without a focus on the result.  This construction is also consistent with the legal definition of foreclosure, which refers to "[a] legal *proceeding* to terminate a mortgagor's interest in property, instituted by the [mortgagee] either to gain title or to force a sale[.]" *Foreclosure*, Black's Law Dictionary (11th ed. 2019) (emphasis added).[13]

[¶69.]    Nevertheless, in the majority's view, "mortgage foreclosures" is referring to the relief obtained by successfully prosecuting a foreclosure action.[14] On the contrary, through the process of mortgage foreclosures, the Legislature has provided each party with a neutral process to resolve their disputes.  Although a mortgagee will be the initiator of the mortgage foreclosure, the proceeding is governed by multiple rules, including statutory requirements to protect a mortgagor's interests.  *See, e.g.,* SDCL 21-48-9 (allowing a mortgagor to require a

---

13.    The majority relies on SDCL chapter 21-47's use of "foreclosure action" as a reference to the process of foreclosing through judicial proceedings rather than "foreclosure" to support their position that "foreclosures" in SDCL 15-17-38 refers to a result.  However, the use of "foreclosure" and "action" in chapter 21-47 will naturally differ from its use in SDCL 15-17-38 because chapter 21-47 deals exclusively with foreclosure *actions* versus foreclosure by *advertisement*, so action must be included to provide a meaningful distinction and avoid confusion as to chapter 21-47's scope.

14.    It would be more accurate to define the foreclosure judgment/decree or the sale of the mortgaged property as the mortgagee's relief.  *See* SDCL 21-48-6, -6.1; SDCL 21-47-23.

mortgagee to initiate a foreclosure action rather than pursue a foreclosure by advertisement). More importantly, the relief provided through mortgage foreclosures is the settlement of property disputes between mortgagees and mortgagors. And as shown by this case, the mortgage foreclosure does not always end in favor of the mortgagee.

[¶70.] Under a proper construction of SDCL 15-17-38, the Trust would be eligible to recover attorney fees in this mortgage foreclosure action. The circuit court's decision to award the Trust attorney fees in the amount of $33,364.85 was not an abuse of discretion and should be affirmed.

[¶71.] ZELL, Retired Circuit Court Judge (dissenting on Issues 1 through 4).

[¶72.] I have reviewed the majority opinion on issues one through four and I respectfully dissent on those issues for multiple reasons.

[¶73.] This writer's first point of dissent regards the standard of review. Even though the majority correctly sets forth the standard of review in a case where summary judgment has been granted, *In re Matheny Fam. Tr.*, 2015 S.D. 5, ¶ 7, 859 N.W.2d 609, 611; *Kirlin v. Halverson*, 2008 S.D. 107, ¶ 10, 758 N.W.2d 436, 443 (citation omitted), it is clear from the facts set forth in its opinion as well as any inferences drawn therefrom, that the facts have been viewed by the majority in a light most favorable to the moving party (Jamie), rather than to the non-moving party, Plains Commerce Bank. This is especially true when reviewing the circumstances surrounding the written "consent" document signed by all interested parties and the application of the same to the waiver of self-dealing by Matthew and the consent's impact upon varying the spendthrift provision.

[¶74.]     The interpretation of a trust instrument is a question of law reviewed de novo, but the interpretation of an instrument altering or varying the application of its provisions would be a question of fact.

[¶75.]     The disposition of cases by summary judgment where the application and interpretation of the law can be impacted by said facts, does not lend to a wise resolution.   A full trial upon all the facts by a trier of fact who can settle the facts based upon the determination of the credibility of witnesses, subject to cross examination, lends to better review and application of the law.   Trial by affidavit and deposition does not sufficiently provide a complete record to resolve the many complicated factual and legal issues in this matter and leads to bad precedence.

SDCL 55-1-41 provides:

> If the trust contains a spendthrift provision, no creditor may reach present or future mandatory distributions from the trust at the trust level.   Moreover, no court may order a trustee to distribute past due mandatory distributions directly to a creditor.

 Yet, SDCL 55-1-53 provides:

> The terms of a governing ***instrument*** may expand, restrict, eliminate, or otherwise vary ***any provisions*** of general application to trusts and trust administration. . . .

(Emphasis added.)

[¶76.]     Although, as set forth by the majority citing *In re Cleopatra Cameron Gift Tr.*, 2019 S.D. 35, ¶ 26, 931 N.W.2d 251, *supra* ¶ 32, the Legislature has placed "formidable barriers between creditor claims and trust funds protected by a spendthrift provision[,]" the Legislature also allowed all interested parties to "expand, restrict, eliminate, or otherwise vary any provisions of general application

to trusts . . . ." SDCL 55-1-53. Here, all interested parties signed a written consent to do just that, waive the self-dealing provision as well as vary the spendthrift provision only as it related to a transaction involving Plains Commerce Bank. The written consent did not otherwise alter or vary these or other trust provisions. A genuine and material question of fact remains as to whether this written consent "instrument" varied the provisions as claimed by Plains Commerce Bank but disputed by Jamie. A trier of fact should resolve those questions.

[¶77.]     This writer's second point of dissent regards the authority cited by the majority in supporting the positions it takes as a matter of law. When reviewing this authority, it is quite clear the facts upon which this authority was based is not on all fours to the facts herein.

[¶78.]     In *In re Stevenson*, 2000 S.D. 24, ¶ 15, 605 N.W.2d 818, 822, the settlor had died before the Trustee sought to engage in self-dealing. The Court found no authority outside the provisions of the trust existed to ratify such action. Here, all interested parties were alive and signed the written consent agreement authorizing the transaction with Plains Commerce Bank.

[¶79.]     The majority also cites *Est. of Long*, 2014 S.D. 26, ¶ 31, 846 N.W.2d 782, 789 (quoting *In re Sunray Holdings Tr.*, 2013 S.D. 89, ¶ 14, 841 N.W.2d 271, 274; *In re Florence Y. Wallbaum Revocable Living Tr.*, 2012 S.D. 18, ¶ 20, 813 N.W.2d 111, 117; *In re Schwan 1996 Great, Great Grandchildren's Tr.*, 2006 S.D. 9, ¶ 12, 709 N.W.2d 849, 852), for the proposition "we first 'look to the language of the trust instrument[,]'" and "[i]f the language of the trust instrument makes the intention of the [settlor] clear, it is our duty to declare and enforce it." The settlors

in the instant case as well as all of the beneficiaries were alive and signed the instrument (written consent) varying the trust provisions which allowed for limited self-dealing and the varying of the spendthrift provision as it related solely to Plains Commerce Bank.  Yet, the majority does not follow its own precedent and follow its "duty to declare and enforce it."  [the "instrument" authorized by SDCL 55-1-53].  The authority cited does not support the majority's opinion as it relates to the facts of this case and should not be given precedential value.

[¶80.]     The majority has not cited any authority, statutory or case law, prohibiting the conduct which took place here and its impact upon the self-dealing and spendthrift provisions.  The majority recognizes the trust provisions which allow for an exception for self-dealing and the statutory support therefore but holds that it does not apply to the spendthrift provision.  The majority does not cite any authority for said position.  SDCL 55-1-53 allows for such varying, especially where, as here, all interested parties including the settlors have authorized the same.  *See* Restatement (Second) of Trusts Section 338(1) cmts d, h.  (Am. Law Inst. 1959) as cited in *Brock v. Premier Tr., Inc.*, 2016 WL 927382 (Nev. 2016); "A trust may be modified, without regard to its original purpose, if the settlor and all beneficiaries consent."  *See also In re Green Valley Fin. Holdings*, 32 P.3d 643, 646 (Colo. App. 2001); *Hein v. Hein*, 543 N.W.2d 19, 20 (Mich. Ct. App. 1995).  "A spendthrift clause, in and of itself, does not prevent modification."  *Hein*, 543 N.W.2d at 20.

[¶81.]     This writer's final reason for dissenting is a concern the majority's opinion will cause in this state regarding an unintended policy involving the

extension of credit between commercial lenders and family-farm trusts. It is clear by the facts of this case the Beck family was engaged in a farming operation. The Becks placed the farm real estate into the Trust but apparently left out the other farm assets (livestock, equipment, grain, etc.).

[¶82.] From the 1990s through the 2000s, numerous farm and ranch families in South Dakota placed their farm and ranch property in "trusts" for numerous reasons. Often these trusts were "canned" trusts and not necessarily drafted for each specific farm/ranch operation. As appears to be the case herein, not all farm assets were transferred into these trusts. When these family farm trusts needed to enter into credit relationships, like here, the parties sought ways, legally, to accomplish the credit relationship that is so crucial to operating the family farm. Now, based upon the majority's opinion, it will be apparent to commercial lenders in the state that no matter what reasonable legal efforts they attempt to accomplish extending a line of credit secured by the assets of the family farm trust, or its menagerie, its efforts will be highly suspect and not worth the risk of extending credit to such an operation due to the courts not upholding the parties' agreement. I do not believe this is what the majority intended, but it has accomplished the same by its decision.

[¶83.] For all of the above reasons, I respectfully dissent. This matter should be reversed and remanded for a trial on these issues.

[¶84.] Lastly, regarding Issue 5, I concur that said fees are not authorized in this action for the reasons the majority writing sets forth.